# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

## STATE OF TENNESSEE  v.  JOHN ADAMS and RITA ADAMS

### Appeal from the Criminal Court for Shelby County
### No. 96-06601     Hon. Chris B. Craft, Judge

---

### No. W1997-00190-SC-R11-CD  —  Decided June 30, 2000

---

We granted this appeal to decide whether a jury must unanimously agree as to the particular serious bodily injury used to support a conviction for aggravated child abuse through neglect. The trial court held that aggravated child abuse through neglect is a single, continuing course of conduct, and that the State was not required, therefore, to make an election of offenses. On direct appeal, the Court of Criminal Appeals affirmed the appellants' conviction and sentence for aggravated child abuse through neglect, and the appellants requested permission to appeal to this Court. After careful analysis of the statute proscribing aggravated child abuse through neglect and a review of other relevant statutory and case authority, we hold that because aggravated child abuse through neglect is a continuing offense, no election is required. The judgment of the Court of Criminal Appeals upholding the appellants' convictions and sentences is affirmed.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of Criminal Appeals is Affirmed**

BARKER, J., delivered the opinion of the court, in which ANDERSON, C.J., and DROWOTA, BIRCH, and HOLDER, JJ., joined.

Robert C. Brooks, Memphis, Tennessee, for the appellant John Adams; Walker Gwinn, Memphis, Tennessee, for the appellant, Rita Adams.

Paul G. Summers, Attorney General and Reporter; Michael C. Moore, Solicitor General; Peter Coughlan, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

The charges in this case arose from the discovery of multiple injuries to four-week-old Dillon Adams. Dillon was born at the Memphis Medical Center on November 28, 1994 to appellants John and Rita Adams. Ms. Adams was addicted to codeine throughout her pregnancy, and she took methadone daily to treat that addiction. Prenatal care during her pregnancy was virtually

nonexistent. Thus, it is no surprise that upon his birth, Dillon suffered from complications which prolonged his stay in the hospital for several days. Dillon suffered from respiratory distress syndrome, and he was also addicted to methadone. Fortunately, the fluid in his lungs was cleared within a few days, and the only lasting side-effect from his methadone addiction appeared to be jitteriness and irritability. He was released from the hospital on December 5, 1994.

On December 24, 1994, paramedics responded to an emergency call from the appellants' home. When they arrived, Mr. Adams was holding Dillon with both hands under Dillon's arms, providing no support to Dillon's head. Dillon was lethargic and struggling to breathe. One paramedic noticed what appeared to be a burn to Dillon's hand that was nearly two inches in diameter. When questioned about the burn, Ms. Adams stated that Dillon "must have" burned his hand on the coffee pot. Dillon was immediately taken to the trauma center at LeBonheur Hospital in Memphis, where he was placed on life support.

Examination by medical personnel at LeBonheur revealed multiple injuries to Dillon. Those injuries included burns to Dillon's hand and foot; a fractured skull; bruising and injury to Dillon's brain; two fractured vertebrae; a fractured rib; a fracture to the middle of the right femur; and fractures of the ends of all the bones in the legs, including the right and left femur, and the right and left tibia. Upon the discovery of the extent of Dillon's injuries, both appellants were arrested, and each was charged with one count of aggravated child abuse by inflicting serious bodily injury and with one count of aggravated child abuse through neglect.

The State introduced several witnesses at the trial. Dr. Thomas Bouldin, a pediatric radiologist who examined X-rays and a CAT scan of Dillon's brain, testified that the primary injuries to the brain were caused by someone violently shaking Dillon. According to Dr. Bouldin, these actions caused the brain to repeatedly hit the cranial wall and caused the blood vessels between the brain and the skull to tear. The result was bruising and injury to brain tissue and a fluid build-up around the brain. In fact, part of Dillon's brain actually dissolved due to the injuries. Dr. Bouldin further determined that the primary injuries to the brain had been caused within twenty-four hours of Dillon's admission to the hospital. The skull fracture appeared to Dr. Bouldin to be several days older.

Dr. Robert Kaufman, another pediatric radiologist, testified as to Dillon's nine other fractures and as to the likely cause of these injuries. He indicated that due to the swelling around the fractured vertebrae, those particular injuries occurred less than twenty-four hours before Dillon's examination at the hospital. Dr. Kaufman testified that vertebrae fractures could generally be caused by flexing the spine forward and compressing it. As to the rib fracture, Dr. Kaufman testified that the injury could have been caused by a shaking action, whereby the perpetrator grabbed and violently compressed the baby's chest. The fracture to the back of Dillon's skull would have been caused by some type of impact to the back of his head. As to the fractures in Dillon's legs, Dr. Kaufman opined that the metaphyseal injuries to the ends of the bones would more likely be caused by a twisting motion rather than an impact. In his opinion, the fracture to the middle of Dillon's femur happened at a different time than the metaphyseal injuries, and it also appeared to Dr. Kaufman that the femur was re-injured after the initial fracture.

After Dillon's release from the hospital, he was placed in the custody of John Smith, who is Ms. Adams' brother. Mr. Smith testified that Dillon still suffered from complications because of his injuries. At the time of trial, some two years after the injuries, Dillon still had a subdural shunt in his head to drain off the fluid build-up around his brain, his right eye wandered, and he still had occasional problems with his breathing that accounted for nearly one hundred visits to the hospital during the year preceding the trial.

Mr. Smith also testified regarding certain admissions made to him by his sister while she was incarcerated awaiting trial. During this time, Ms. Adams sent Smith a series of letters in which she took partial responsibility for Dillon's injuries. In one letter, she admitted "accidentally" burning Dillon's hand on the stove while bathing him, and she also related an occasion when Mr. Adams fell asleep while holding Dillon, dropped his cigarette on Dillon's foot, and burned a hole through Dillon's pajamas. In an attempt to explain Dillon's various fractures, she wrote that on one occasion, Mr. Adams placed Dillon in bed with her while she was sleeping. Unaware that Dillon was in the bed, she pulled the covers off the bed with Dillon in them, causing him to fall on the floor. She also related that on the night Dillon was taken to the hospital, Mr. Adams had shaken Dillon in an effort to revive him after he stopped breathing. In several of her letters, Ms. Adams exonerated her husband and took full responsibility for Dillon's injuries. In other letters, though, she characterized her treatment of Dillon as "mistakes," and denied doing anything to deliberately hurt him.

At trial, defendant Rita Adams testified in her own defense. She admitted taking methadone during her pregnancy with Dillon. Although she stated that Dillon had been an irritable baby from the time she brought him home, she denied doing anything to deliberately harm him. To explain the inconsistencies between her testimony and the letters she sent to her brother, Ms. Adams said that family members had convinced her that she "must have" done something to cause Dillon's injuries.

Defendant John Adams also testified in his own defense at trial. He related that Dillon was an irritable baby from the time he came home from the hospital. Mr. Adams testified that Dillon cried constantly, except for when he was being fed or when he was sleeping. The week before Dillon was admitted to the hospital, Mr. Adams noticed a burn on Dillon's hand when he returned home from work. When he asked his wife about it, she told him that Dillon had burned it on the coffee pot while she was bathing him and that she had treated the burn with antibiotic ointment. He testified that he believed her story.

Within a day or two of this incident, Mr. Adams testified that he noticed a bruise on Dillon's back. While his wife disclaimed any knowledge of what caused this bruise, it was at this point that Mr. Adams began to suspect that his wife was abusing Dillon. Further, although his wife informed him that Dillon's right leg was swollen two days before Dillon was admitted to the hospital, Mr. Adams denied observing any life-threatening injury that required medical treatment before Dillon's scheduled check-up the week after Christmas. Regarding the burn to Dillon's foot, Mr. Adams admitted that on the evening of December 22, 1994, he was smoking a cigarette in his recliner while holding Dillon and feeding him. He stated that he dozed off and then later awoke when he felt the cigarette burning his chest. Although the cigarette burned a hole through Dillon's pajamas, Mr. Adams did not see any injury to Dillon's foot.

Mr. Adams also testified that Dillon appeared healthy earlier during the evening that he was admitted to the hospital. Mr. Adams stated that he and his wife left Dillon in the care of Mrs. Adams' fourteen-year-old son while they went out to finish some Christmas shopping. When they returned after midnight, though, they were told that Dillon had been vomiting. Mr. Adams warmed a bottle and began feeding Dillon. During the feeding, Dillon began regurgitating milk from his nose. His eyes began twitching, his lips turned blue, and he stopped breathing. Mr. Adams admitted that he shook Dillon in an effort to revive him, and when that was unsuccessful, he asked his wife to call an ambulance. She panicked, and he was required to lay Dillon down while he called for help himself. After calling the ambulance, Mr. Adams began administering cardiopulmonary resuscitation techniques.

Detective Veretta Mhoon of the Memphis Police Department testified that she was assigned to investigate the reported abuse of Dillon Adams. On December 27, 1994, Mr. Adams gave her a statement in which he admitted knowing about the burn to Dillon's hand. He further stated that when he asked his wife about the burn, she told him that Dillon had burned his hand on the coffee pot while she was bathing him. Mr. Adams also admitted knowing that when he tried to change Dillon's diaper, Dillon would scream and that Dillon was not eating as well as he should have been. Although he had suggested that they take Dillon to the doctor, he stated that his wife refused. In this statement, Mr. Adams also admitted that he suspected his wife was giving Dillon "mini-thins," an unprescribed medication.

At the conclusion of the evidence, the defense moved to require the State to elect the injury upon which it sought conviction for each count of aggravated child abuse. The trial court granted the motion insofar as the charge of aggravated child abuse through infliction of injury, and the State elected the burn to Dillon's hand as the act upon which they sought conviction for that charge. However, because the court believed that neglect was a continuing offense, it did not require election with respect to the charge of aggravated child abuse through neglect. The jury subsequently acquitted both appellants on the charge of aggravated child abuse through infliction of serious bodily injury, although it found Rita Adams guilty of simple assault. The jurors also convicted both appellants of aggravated child abuse through neglect, and each defendant was sentenced to serve twenty years in the Department of Correction.[1]

The Court of Criminal Appeals affirmed both the convictions and the sentences. Before this Court,[2] the appellants now argue that the failure to require the State to elect the injury upon which it relied for a conviction of neglect deprived them of their fundamental right to a unanimous jury

---

[1] Rita Adams also received a concurrent sentence of ninety days for the simple assault conviction.

[2] This Court heard oral argument in this case on November 18, 1999 in Memphis, Shelby County, Tennessee, as part of the S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

verdict in contravention of <u>State v. Shelton</u>, 851 S.W.2d 134 (Tenn. 1993), and <u>Burlison v. State</u>, 501 S.W.2d 801 (Tenn. 1973). We disagree and affirm the judgments of the lower courts.

### ANALYSIS

"This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." <u>State v. Brown</u>, 992 S.W.2d 389, 391 (Tenn. 1999) (citing <u>Tidwell v. State</u>, 922 S.W.2d 497 (Tenn. 1996); <u>State v. Shelton</u>, 851 S.W.2d 134 (Tenn. 1993); <u>Burlison v. State</u>, 501 S.W.2d 801 (Tenn. 1973)). This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. <u>Brown</u>, 992 S.W.2d at 391; <u>Burlison</u>, 501 S.W.2d at 803. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately touching on the constitutional rights of an accused . . . ." <u>Burlison</u>, 501 S.W.2d at 804.

When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

Continuing offenses generally stem from a single motivation or scheme, although such offenses can be committed by multiple discrete acts occurring over a period of time. For example, in <u>State v. Hoxie</u>, 963 S.W.2d 737 (Tenn. 1998), we concluded that the offenses of stalking and telephone harassment were continuing offenses because the statutory language contemplated a series of discrete actions amounting to a continuing course of conduct. <u>Id.</u> at 743. In concluding that the offense punished a single continuing course of conduct, we stated that while the offenses involved numerous discrete parts, the defendant was not in danger of receiving a non-unanimous jury verdict. <u>Id.</u> ("While we agree with the Court of Criminal Appeals that the unlawful actions which constitute the offense of stalking may in some instances be separate distinct crimes, we conclude that when the only offense charged requires proof of a continuous course of conduct, the election requirement does not apply.").[3]

---

[3] We also noted in <u>Hoxie</u> that because the charges specified the dates during which the defendant's conduct was alleged to have occurred, the defendant was placed on notice of the general nature of the conduct with which he was charged, and he was protected from future prosecution for

Likewise, in State v. Legg, 9 S.W.3d 111 (Tenn. 1999), we concluded that the offense of kidnaping was a continuing offense based upon the language of the statute and the nature of the offense. We analyzed the statutory elements of "removal" and "confinement" and noted that the very nature of removal or confinement did not lend itself to division into segments of time with various points of termination. Furthermore, we stated that "an act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime at every moment the victim's liberty is taken." Id. at 117. Because the terms "removal" and "confinement" contemplated a continued state of being restrained, we held that the General Assembly must have intended to punish a continuing course of conduct by using these terms.

Although the appellants in this case argue that child abuse through neglect may "be seen as multiple occasions of neglect, each of which results in serious bodily injury," these cases illustrate that a continuing offense may be composed of multiple discrete acts where a single scheme or motivation is present. Nevertheless, we have previously stated that we will find that an offense punishes a continuing course of conduct "only when 'the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that [the legislature] must assuredly have intended that it be treated as a continuing one.'" Id. at 116 (quoting Toussie v. United States, 397 U.S. 112, 115 (1970)). In deciding whether an offense is a continuing one, therefore, this Court will look to the statutory elements of the offense and determine whether the elements of the crime themselves contemplate punishment of a continuing course of conduct. See id.

Aggravated child abuse through neglect is proscribed by Tennessee Code Annotated sections 39-15-401(a) and -402(a), and according to these sections, the offense requires proof that a person knowingly neglect a child so as to adversely affect the child's health and welfare, and that the neglect results in serious bodily injury to the child. See Tenn. Code Ann. §§ 39-15-401, -402(a). (1997). Although the term "neglect" is not expressly defined by either of these statutes or by any other provision of the criminal code, the legislature has defined the term "neglect" in other parts of the Tennessee Code. It is a common rule of statutory construction that where two or more statutes deal with the same subject matter or share a common purpose, then this Court should consider the other statutes when construing any one of them. See, e.g., Mandela v. Campbell, 978 S.W.2d 531 (Tenn. 1998); Stevens v. Linton, 190 Tenn. 351, 354, 229 S.W.2d 510, 512 (1950). Consequently, definitions of the term "neglect" in other parts of the Tennessee Code may be helpful to determine the meaning of the term "neglect" in the criminal code.

Part 1 of Title 37 of the Tennessee Code providing for the juvenile courts defines the term "dependent and neglected child" as being a child "[w]hose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child," Tenn. Code Ann. § 37-1-102(b)(12)(D) (1996 & Supp. 1999); and as a child who "is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the

---

stalking or harassment during this same time period. 963 S.W.2d at 734. Consequently, the state was not required to make an election of offenses.

morals or health of such child or others," Tenn. Code Ann. § 37-1-102(b)(12)(F). Part 5 of the same Title dealing with the Department of Children's Services also provides for the same definition of a "dependent and neglected child." See Tenn. Code Ann. § 37-5-103(8)(D), -103(8)(F).

In addition, the Tennessee Adult Protection Act seeks to "protect adults [who are in the care of others because of mental or physical dysfunctioning or advanced age] . . . from abuse, neglect, or exploitation . . . ." The term "abuse or neglect" is defined by the act as being

> the infliction of physical pain, injury, or mental anguish, or *the deprivation of services by the caretaker which are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services which are necessary to maintain that person's health or welfare.*

Tenn. Code Ann. § 71-6-102(1) (1995 & Supp. 1999) (emphasis added).

A plain reading of the statutes in Title 37 reveals that the primary purpose of these statutes, like that of the criminal child abuse statute, is to prevent acts of child neglect and to protect and care for children who are victims of neglect. For example, the juvenile courts are vested with the power to transfer temporary custody of dependant and neglected children to other persons for the "protection and physical, mental and moral welfare of the child," Tenn. Code Ann. § 37-1-130(a), and the Department of Children's Services has the authority to "[a]dminister, develop and/or oversee programs," such as child protective services "reasonably necessary" to assist dependant and neglected children. See Tenn. Code Ann. § 37-5-106(a). Similarly, the neglect provisions of the Adult Protection Act are designed to protect persons who are under the care of another or who are otherwise unable to care for themselves from "abuse, neglect, or exploitation." Tenn. Code Ann. § 71-6-101(b)(1). Although not specifically dealing with children, the purpose of the Adult Protection Act is similar to that of the criminal child neglect statute, because both statutes are designed to protect from harm those persons who must depend on others for their health and well-being. Therefore, the "neglect" provisions in these statutes are particularly appropriate to consider when construing the meaning of "child neglect" in the criminal code.

Analysis of these other definitions of "neglect" clearly demonstrates that the General Assembly considers the act of neglect to be a continuing course of conduct. For example, in Title 37, the General Assembly uses the phrases "refuses to provide" and "is in such condition of want." These terms do not contemplate that neglect is complete upon the initial refusal to seek care or upon the first minute a child is in want. Rather, neglect through a refusal to provide medical or hospital care lasts as long as such care is not provided, and a child continues to be in "a situation of want" as long as the morals or health of the child is endangered.

Likewise, the neglect provision of the Tennessee Adult Protection Act uses phrases such as "the deprivation of services . . . necessary to maintain the health and welfare" and "a situation in which an adult is unable to provide or obtain services . . . necessary to maintain that person's health or welfare." As in Title 37, these phrases contemplate that neglect is a continuing course of conduct. Neglect under the Adult Protection Act does not end immediately upon the initial deprivation of

health or welfare services by a caretaker, nor does it end upon the first minute that a person covered by the Act is placed in a situation where he or she is unable to obtain such services. Rather, the neglect continues until such services are provided or until the person is in a position to obtain such services on their own.

Because the neglect provisions of Title 37 and the Tennessee Adult Protection Act share both the same subject matter and purpose as that of the criminal child neglect provisions in sections 39-15-401 and -402, we construe all of these provisions in *pari materia* and give each a similar interpretation. Therefore, as evidenced by these other statutes in the Tennessee Code, we hold that the General Assembly intended for the offense of aggravated child abuse through neglect to punish a continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare.

Indeed, it would be an absurd construction to hold that criminal child neglect is complete as soon as the child's health and welfare are first adversely affected, especially when the child remains in this condition for a substantial period of time. Neglect simply does not lend itself to division into segments of discrete acts each having various points of termination. Cf. Legg, 9 S.W.3d at 117. Rather, a more reasonable construction of the offense supports the view that the offense continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect.

Applying these principles to this case, we find that the evidence is clear that some of the injuries that Dillon suffered were obvious—the burn to his hand, the burn to his foot, the bruise to his back, and his swollen leg, for example. Both appellants were aware that Dillon cried constantly when he was awake, and they were aware that his cries became more urgent when he was being handled, such as when his diaper was changed. Further, the evidence shows that the appellants were aware that Dillon may have needed professional treatment and that each defendant actually contemplated seeking such treatment.

Therefore, given the appellants' knowledge and awareness of Dillon's obvious physical anguish, the decision to knowingly forego medical treatment, at whatever point in time it was made, constituted criminal child neglect, and this neglect continued until Dillon was finally taken to the trauma center under emergency circumstances. This is not a case in which the conduct of the appellants can be broken into separate and discrete periods of time and space. Rather, the neglect in this case was continuous and without interruption. We conclude, therefore, that this entire period of knowing neglect by the appellants constitutes one crime and that the State was not required to make an election of offenses.

The appellant's argument that the State should be required to elect the particular serious bodily injury resulting from the neglect misconstrues the nature of the election doctrine. To adopt the appellant's argument that the jury must agree as to the specific serious bodily injury requires, in essence, that the state elect the *facts to support elements* rather make an election of *offenses*. Our cases have not required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged. See, e.g., State

v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999); State v. Cribbs, 967 S.W.2d 773, 787 (Tenn. 1998). The fact that multiple injuries have arisen out of one continuing period of neglect does not somehow transform the essential nature of the offense itself. We find the appellants' argument in this respect to be without merit.

## CONCLUSION

Because we find that the offense of child abuse through neglect is a single, continuing offense, we hold that the State was not required to make an election of offenses. We also hold that the failure of the trial court to require the State to make an election did not deprive the appellants of their constitutional right to a unanimous jury verdict. We therefore affirm the judgment of the Court of Criminal Appeals upholding the conviction and sentence of each defendant.

Costs of this appeal shall be divided equally among the appellants, John and Rita Adams, for which execution shall issue if necessary.