# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 19, 2002 Session

## STATE OF TENNESSEE v. JANET HUFFINE DYKES

**Appeal from the Criminal Court for Washington County**
**No. 26191     Robert E. Cupp, Judge**

---

**No. E2001-01722-CCA-R3-CD**
**August 16, 2002**

---

The Defendant, Janet Huffine Dykes, was convicted by a jury of one count of reckless aggravated assault and one count of aggravated child abuse through neglect. The trial court merged the assault conviction into the child abuse conviction and sentenced the Defendant as a Range I standard offender to fifteen years in the Department of Correction. The Defendant now appeals as of right, challenging the sufficiency of the evidence in support of her convictions. We find the evidence is not sufficient to support the Defendant's conviction of aggravated child abuse through neglect and therefore reverse that conviction. We find the evidence sufficient to support the reckless aggravated assault conviction, and affirm that conviction. Because the Defendant was not sentenced for reckless aggravated assault, we remand this case for sentencing on the Defendant's conviction for reckless aggravated assault.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed in Part;**
**Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA McGEE OGLE, J., joined.

A. Scott Pratt, Jonesborough, Tennessee, for the appellant, Janet Huffine Dykes.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Joe Crumley, District Attorney General; and Steve Finney, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant has two children, a son and a younger daughter. In the spring of 2000, the Defendant was thirty-four years old; her son, Patrick, was eight; and her daughter, Marisa, was eighteen months old. In the fall of 1999, the Defendant began seeing Joe Hankal, a divorced father of three daughters. The Defendant testified that Hankal was good to her children, and she had hoped that they would eventually marry. She acknowledged, however, that Hankal was taking numerous prescription drugs during the time they were seeing each other. She explained that Hankal told her the drugs were for "a slight nerve problem." She further explained that she felt his drug taking "was safe because . . . he seemed to be fine" and she knew they were prescription drugs. She denied ever obtaining any of Hankal's drugs for him.

The Defendant testified that, on the night of April 12, 2000, she bathed Marisa and did not notice anything on her head. She stated that Marisa "didn't play quite as much in the bathtub," but explained that Marisa had been sick, was on antibiotics, and was teething. After bathing Marisa, the Defendant, Hankal and Marisa attended a car sale while the Defendant's son, Patrick, was at church. During the sale, the Defendant testified, Marisa was "fine" and walked part of the time they were there. When they returned, Hankal put Marisa to bed, as had become his routine by this time. Hankal left the house at about midnight. Before going to bed herself, the Defendant checked on Marisa and testified that she seemed "[f]ine."

The next morning, Hankal returned at about 7:20, according to the Defendant. Marisa woke up crying at 7:30, and the Defendant told Hankal, "She's not ready to get up. She's just awake. She needs a little bit more sleep." Hankal got Marisa from her bed and took her to the Defendant's bedroom, where he laid Marisa in the Defendant's bed. The Defendant was elsewhere in the house at this time. About an hour to an hour and forty-five minutes later, the Defendant testified, she heard Marisa stirring. She went in to get her up for the day, and testified about what she found:

> I opened the bedroom door and I saw her laying in the middle of the bed. I didn't know anything was wrong at that time, and I said, 'Mommy's little girl ready to get up?' And she didn't move. I went and picked her up. Her eyes looked real funny. They were rolled back in her head. She had just, like, a stare. It looked like she was looking at me but she couldn't see me. And I said, 'Marisa, Marisa,' and I just kind of shook her a little bit. I said, 'Marisa, what's wrong? What's wrong?' She wouldn't even cry. And I hollered and I said, 'Oh, God, Joe, come here. Come here. Something's wrong with Marisa.' He come running in there. And he said – I said, 'Something's wrong.' The very first words he said, he said, 'Oh, God, she might have got a hold of one of my pills. One of my pills might have fell out of my pocket.' And I said, 'Hurry, go call 911.' She was just lifeless and limp. I didn't know what was wrong with

> her. He said, 'No, I'm not going to call 911. Let's go ahead and just
> take her on to the hospital.'

The Defendant and Hankal drove Marisa to the hospital, taking her to the emergency room. As medical personnel began treating the child, she had a seizure.

The Defendant testified that she did nothing to hurt Marisa, and that she did not know how Marisa was hurt.

Marisa was admitted to the hospital, and x-rays were taken, revealing a non-displaced fracture in the left tenth rib and a non-displaced spiral fracture of the right humerus (the upper arm). Dr. Glynda Ramsey, a radiologist, testified that these injuries probably occurred within forty-eight hours of the x-rays, and could have occurred as little as "one minute" before. She explained that the rib injury could have been caused by intentional squeezing or by direct blunt force. She explained that the arm injury involved "some twisting mechanism." She testified that neither of these injuries was common in young children. The x-rays also revealed healing fractures to Marisa's right forearm, near the wrist. Dr. Ramsey testified that these injuries were probably less than six months old, and could have been caused by a fall or a direct blow. Dr. Ramsey also testified that these fractures were "healing in normal alignment."

A CT scan of the brain performed on April 13, 2000, revealed a hematoma on Marisa's left scalp, described by Dr. Ramsey as "like a blood clot internally in the scalp." The hematoma was about three inches in size. This injury was the result of blunt trauma, but Dr. Ramsey could not determine whether the injury occurred from a fall or from a blow. Dr. Ramsey stated that this injury was not "readily visible."

On April 18, 2000, a bone scan was performed. This procedure revealed an additional injury to Marisa's growth plate at her right ankle. Dr. Ramsey testified that this injury was also zero to forty-eight hours old.[1] Dr. Ramsey testified that this injury to Marisa's ankle was probably not caused by a fall, but could have been caused by holding the child by her ankles, or by a direct blow. Dr. Ramsey testified that it was likely that Marisa's recent fractures and the hematoma "all occurred at the same time" and were "consistent with non-accidental trauma." Marisa was released from the hospital to the care of her father on April 20, 2000.

Dr. William Bridgforth, a pediatrician, testified that, in his opinion, "the most probable cause for the seizures was trauma to [Marisa's] head." An electroencephalogram, or "brain wave test," showed no abnormalities. The CT scan of Marisa's brain also came back normal. A drug screen was also performed on Marisa, and came back negative for drugs in Marisa's bloodstream. As to other injuries, Dr. Bridgforth testified that there were recent fractures to Marisa's right lower leg, upper

---

[1]We note that Marisa was in the hospital during the entire forty-eight hours preceding the bone scan.

right arm, and tenth rib. There was a "probable" healing fracture to her left upper arm bone,[2] and two old fractures of the right lower arm. Dr. Bridgforth testified that Marisa's recent fractures were serious bodily injuries and that Marisa "was unable to walk because of her leg fracture so it was very painful." Dr. Bridgforth also testified to bruises on Marisa's left upper chest, right chest, left calf, three bruises on her back, bruises on her left cheek and beside her right eye, and a bruise of her left eyeball. Dr. Bridgforth testified that these bruises were "not in the right location for normal toddler bruises" and that some of them were several weeks old. In Dr. Bridgforth's opinion, Marisa's recent injuries were the result of child abuse. He testified that the hematoma was recent and could have occurred in conjunction with the recent fractures. Dr. Bridgforth also testified that the Defendant had brought Marisa to his pediatrics practice group on ten occasions when Marisa was suffering some illness. The records kept by the pediatrics group contained no evidence or suspicion of abuse. Dr. Bridgforth testified that Marisa's shots were up-to-date.

Joe Hankal testified that it was routine for him to put Marisa to bed on the evenings that he spent with the Defendant. He testified that the Defendant was "good to" Marisa, and that he never saw her do anything to hurt Marisa. He further stated that he "never done nothing to hurt" Marisa. He acknowledged, however, that he had ridden Marisa around with him on motorcycles and dune-buggies.

Hankal testified that he could not remember whether the Defendant and Marisa went with him to the car sale on the night of April 12, 2000. He did remember being at the Defendant's house that evening, and testified that Marisa had been "fine." He testified that he returned the next morning at about nine o'clock. He explained that, at that time, Marisa was "whining in her crib," so he "went into the bedroom and got her and went and laid down in [the Defendant's] bed with her, and she went back to sleep." Hankal then joined the Defendant. A "short time" later, he testified, the Defendant went to her bedroom to get Marisa up. A few minutes later, he heard the Defendant call him, saying that something was wrong with Marisa. When he went into the bedroom, he testified, Marisa "was just kindly limp and her eyes -- she just couldn't focus." The Defendant wanted to call 911, but Hankal was worried that one of his pills might have fallen out of his pocket and that Marisa had swallowed it; he thought they could get Marisa to the hospital more quickly if they took her themselves.

Hankal testified that, two weeks after the incident with Marisa, he entered a drug rehabilitation program. He testified that he had been abusing Lortab, Xanax, Elavil, Paxil, Valium and Adapin during the time he was seeing the Defendant. He stated that he mixed these drugs and sometimes took fifteen to twenty pills in one day. He stated that the Defendant knew how many drugs he was taking, and that she obtained some of them for him.

---

[2]Dr. Ramsey testified that the initial x-rays indicated some possibility of this fracture, but later tests revealed no abnormality.

Sgt. Tom Frayer investigated the suspected child abuse. He began his investigation on April 17, 2000. He testified that he observed a hematoma on Marisa's right forehead while she was in the hospital, but saw no other visible signs of injuries. His initial interview was with Patrick Dykes at school. He then interviewed the Defendant on April 18, 2000. In this initial statement, which was admitted at trial, the Defendant explained that Marisa had come down with ear and viral infections about two weeks earlier and was on antibiotics. She stated that she had never seen her son hit or hurt Marisa, but that he did play roughly with her, including "pick[ing] her up by an arm." She stated to Sgt. Frayer that "nothing" had happened on April 12, 2000. Her description of the events of April 13, 2000 were consistent with her trial testimony. She also stated that Marisa had never had seizures in the past, and that she had "never in [her] life suspected anything like this."

Sgt. Frayer took another statement from the Defendant on September 7, 2000, which was also admitted at trial. In this statement, the Defendant reiterated that she had not hurt her child, and maintained that "Joe did." She explained,

> I thought at the time he really loved her. But now I can look back and know that he was just plain old obsessed with her. He would take her and lay down with her and close the door. And I am guilty of that, for allowing him to take my baby behind closed doors. I loved and trusted this man. I had no reason not to trust him. He had three kids of his own he was wonderful with. He was great with the kids in front of me. Patrick loved him.

Again, she stated that Marisa had been fine on the night of April 12, 2000, and that she "wasn't hurting until the next morning." When Sgt. Frayer asked her when the injuries could have occurred, she stated, "That morning." She further stated that she didn't hear anything that led her to believe that Hankal was hitting her. She stated that she never saw her son Patrick hit Marisa, but explained that Patrick and Hankal's children played "rough" with her. She stated that she had no idea about how the old fractures could have occurred.

During her second statement to Sgt. Frayer, the Defendant said that she had asked Hankal if, due to his drug abuse, he could have hurt Marisa and not known it. According to the Defendant's statement, Hankal answered this question affirmatively. At that point, she told Sgt. Frayer, Hankal's father took him to the drug rehabilitation facility.

Sgt. Frayer testified that he spoke with a total of five people about the case, other than medical personnel. He stated that he investigated Hankal but found nothing to show that he had inflicted Marisa's injuries.

On cross-examination, Sgt. Frayer admitted that he had decided to seek an indictment against the Defendant by April 21, 2000, after speaking with medical personnel, the Defendant, Hankal, and Patrick Dykes. He admitted that he never entered the Defendant's house. He took no photographs of the victim. He did not obtain Marisa's medical history to check for evidence of prior abuse. He admitted that he quickly made up his mind that the Defendant had inflicted Marisa's injuries, and

that he eliminated Hankal as a suspect early on. He admitted that he did not attempt to obtain any records from Hankal's drug rehabilitation facility in an effort to determine if he made any admissions regarding the case. When asked if he could have done a great deal more of an investigation in this case, he stated, "I guess."

## ANALYSIS

The Defendant in this case was charged with alternative counts of aggravated child abuse: the first count designates that the abuse occurred through the infliction of serious bodily injury, and the second count designates that the abuse occurred through neglect. With respect to the first count, the trial court charged the jury with the lesser-included offenses of intentional or knowing aggravated assault, reckless aggravated assault, and child abuse. With respect to the second count, the trial court charged the jury with the lesser-included offense of child neglect. The jury convicted the Defendant of reckless aggravated assault under Count One, and aggravated child abuse through neglect under Count Two. The trial court subsequently merged the reckless aggravated assault conviction into the aggravated child neglect conviction. The Defendant now challenges both convictions on sufficiency grounds.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

A crime may be established by circumstantial evidence alone. See State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, before an accused may be convicted of a criminal offense based only upon circumstantial evidence, the facts and circumstances "must be so strong and

cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). In other words, a "web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 613; see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998) ("In convictions . . . where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt.").

Aggravated child abuse through neglect occurs when a person "knowingly, other than by accidental means, . . . neglects [a child under eighteen (18) years of age] so as to adversely affect the child's health and welfare," and serious bodily injury results. See Tenn. Code Ann. §§ 39-15-401(a), 39-15-402(a)(1). "Serious bodily injury" is defined as bodily injury involving: "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(34). Thus, to support a conviction of aggravated child neglect, the State must prove beyond a reasonable doubt that the accused knowingly neglected a child, and that the knowing neglect resulted in serious bodily injury to the child.

The term "neglect" is not defined in our criminal code. Accordingly, our supreme court has looked to definitions of the term in other parts of the Tennessee Code. See State v. Adams, 24 S.W.3d 289, 295-96 (Tenn. 2000). One of the definitions the court found helpful in construing criminal neglect is found in the provisions for juvenile courts, and states that a neglected child is one "[w]hose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child," id. at 295 (quoting Tenn. Code Ann. § 37-1-102(b)(12)(D) (1996 and Supp. 1999)), or one who "is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;" id. (quoting Tenn. Code Ann. § 37-1-102(b)(12)(F)). The court also looked to the Tennessee Adult Protection Act which defines neglect as "the deprivation of services by the caretaker which are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services which are necessary to maintain that person's health or welfare." Id. (quoting Tenn. Code Ann. § 71-6-102(1) (1995 & Supp. 1999)).

What a conviction of aggravated child abuse through neglect requires, then, is proof that the accused knew of some need that the child had, and then failed to supply that need, resulting in serious bodily injury to the child. For instance, in the case before us, the proof would be sufficient to support the Defendant's conviction if the record contained proof that the Defendant knew of the injuries Marisa suffered during the forty-eight hours prior to her admission to the hospital, failed or refused to seek medical treatment for them, and serious bodily injury resulted from the failure to seek treatment. The record does not contain such proof. On the contrary, the Defendant testified that she realized something was wrong with Marisa on the morning of April 13, 2000. She immediately

-7-

sought medical care. The medical testimony established that Marisa was suffering from a hematoma and several fractures, all occurring from "one minute" to forty-eight hours prior to Marisa's entering the hospital. Even if the jury chose to disbelieve the Defendant's testimony, there is no proof in the record that Marisa suffered from her injuries for some significant period prior to being taken to the hospital. Nor is there any proof that Marisa suffered any further injury from any delay in receiving medical care, or that the seizures would not have occurred had she received earlier medical care. In short, there is simply no proof in the record that the Defendant knew Marisa was injured and delayed seeking treatment for those injuries such that serious bodily injury resulted. Cf. State v. Hodges, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998) (finding the evidence sufficient to support a conviction of murder during the perpetration of aggravated child abuse through neglect where the proof established that the defendant knew the child was in serious medical trouble, took no action to provide medical attention for the child, and the child died as a result).

There is also no proof in the record to support a finding that the Defendant was criminally negligent in allowing Hankal to be alone with Marisa. While there is certainly proof that Hankal was abusing drugs while spending time with the Defendant and Marisa, there is no proof in the record that he harmed Marisa prior to April 13, 2000, and that the Defendant knew about it but continued to allow him to take care of Marisa. Indeed, Sgt. Frayer testified that his investigation revealed nothing to indicate that Hankal had abused Marisa.[3]

We acknowledge that the jury may have disbelieved the Defendant's testimony. However, the medical proof adduced at trial established "serious bodily injury" only with respect to the fractures Marisa suffered in April.[4] Thus, even if the jury determined that the Defendant was lying about her discovery of Marisa's April injuries, and concluded that the Defendant had known about them for up to forty-eight hours prior to seeking medical care, there is no proof from which a rational jury could conclude that the delay -- that is, the neglect -- caused serious bodily injury as required by the statute. See State v. Mateyko, 53 S.W.3d 666, 667 (Tenn. 2001) (holding that a conviction of child abuse through neglect requires proof that the neglect causes "an actual, deleterious effect or harm to the child's health and welfare and that the mere risk of harm is insufficient to support a conviction"). And, with respect to the medical proof that Marisa had suffered some fractures in the past, there is no proof in the record that the Defendant was aware of these injuries or that, even if she was, her failure to seek medical treatment for them resulted in serious bodily injury.

In short, the State failed to adduce the necessary proof to establish that the Defendant neglected Marisa, and that the neglect resulted in serious bodily injury to Marisa. Accordingly, we

---

[3]We note, however, that Hankal was the last person with Marisa prior to the Defendant's insisting that she be taken to the hospital.

[4]Dr. Bridgforth testified that Marisa's leg fracture caused extreme physical pain, one of the statutory definitions of "serious bodily injury." There was no testimony establishing that any of the other injuries met the statutory definition of "serious bodily injury."

-8-

must reverse the Defendant's conviction for aggravated child abuse through neglect and dismiss that charge.[5]

We turn now to the Defendant's conviction for reckless aggravated assault. That offense is committed upon the accused's recklessly causing serious bodily injury to another. See Tenn. Code Ann. § 39-13-102(a)(2)(A). "Reckless"

> refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(c).

The Defendant was convicted of reckless aggravated assault under Count One of the indictment, which charged her with causing the April injuries to Marisa, including the hematoma, rib fracture, upper arm fracture, and the fractures near Marisa's ankle. Dr. Ramsey testified that the rib injury was the result of "intentional squeezing" or direct blunt force. She testified that the upper arm injury involved "some twisting mechanism." The ankle injury, she testified, could have been caused by holding Marisa by her ankles. The nature of these injuries indicates treatment that was at least "reckless." Intentionally squeezing an eighteen-month-old child around the rib cage constitutes a gross deviation from the applicable standard of care. Similarly, twisting a young child's arm, and/or holding her by her ankles constitutes a gross deviation from the applicable standard of care. Thus, the proof is sufficient for a rational jury to conclude that someone recklessly inflicted these serious bodily injuries upon Marisa.

The proof established that the Defendant was Marisa's primary caretaker during the forty-eight hour period during which the injuries occurred. In the light most favorable to the State, the proof established that the injuries were caused either by the Defendant's actions or the actions of Joe Hankal. There certainly was no direct evidence that the Defendant inflicted the injuries. Joe Hankal testified that he did nothing to inflict the injuries and that he did not know how the injuries occurred. The Defendant also testified that she did nothing to inflict the injuries and that she did not know how the injuries occurred. The jury obviously discredited the Defendant's testimony and found the Defendant to be untruthful. The credibility of the witnesses, especially the credibility of the Defendant and Joe Hankal, was the crucial issue for the jury to resolve. The jury resolved this issue in the State's favor. This, we think, is sufficient to entitle the jury to conclude that the Defendant

---

[5]There is likewise no proof that the Defendant neglected Marisa and thereby caused bodily injury. Accordingly, we are also unable to sustain a conviction of the lesser-included offense of child abuse through neglect.

recklessly handled Marisa, thereby causing serious bodily injury. Accordingly, the evidence is sufficient to support the Defendant's conviction for reckless aggravated assault.

Because the trial court merged the reckless aggravated assault conviction into the aggravated child abuse through neglect conviction, the Defendant was not sentenced for the assault. We therefore remand this matter for sentencing on the reckless aggravated assault conviction. The Defendant's conviction for aggravated child abuse through neglect is reversed and dismissed.

_____
DAVID H. WELLES, JUDGE