IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. MICHAEL JOHN STITTS

**Appeal from the Circuit Court for Madison County**
**No. 01-104     Roy B. Morgan, Jr., Judge**

_____

**No. W2001-02555-CCA-R3-CD  - Filed January 10, 2003**

_____

The defendant, Michael John Stitts, appeals as of right his conviction by a jury in the Madison County Circuit Court for aggravated assault, a Class C felony.  He received a sentence of nine years in the Department of Correction as a Range II, multiple offender.  He contends (1) that the evidence is insufficient to support his conviction and (2) that the trial court should have required the state to elect between two counts of aggravated assault.  We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Didi Christie, Brownsville, Tennessee; George Morton Googe, District Public Defender; and Stephen P. Spracher, Assistant Public Defender, for the appellant, Michael John Stitts.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises out of the October 1, 2000 assault on LaShonda Hudson.  The defendant was indicted for aggravated burglary, aggravated assault while enjoined by an order of protection, aggravated assault with a deadly weapon, and destruction of a utility line.  At trial, the victim testified that she had dated the defendant in January and February 2000.  She said that in June 2000, she obtained an order of protection against the defendant.  The order required the defendant to stay away from the victim; to refrain from contacting her in any location, including her home; and not to use or threaten physical force against her.  The order, which was entered on June 21, 2000, expired on June 21, 2001.  The victim said that in October 2000, she lived at 319 North Lindsey Street with her two daughters and Timothy Williams.

The victim testified that around 1:00 a.m. on October 1, 2000, she was awakened by the sound of a window breaking. She said that Mr. Williams was not there that night. She said that she went to her kitchen and saw that the window beside the kitchen door was broken and that a board, which had previously covered the bottom of the window, had been pushed away from it. She said that she did not see anyone and that she went to her daughters' room. She said that one of her daughters was awake and that they crawled into the living room to the telephone. She said that although she had used the telephone earlier that night, she could not call 9-1-1 because the telephone line was dead. She said that she heard a noise in her daughter's room and returned to find that the defendant had pushed a board in the window beside the air conditioning unit into the room. She said that he had stuck his head inside through the opening and that a street light allowed her to see his face. She said that she asked the defendant why he was doing this but that he did not reply. She said that she told her daughters to stay there and that she was going next door to use the telephone.

The victim testified that she went to her door and looked outside. She said she saw the defendant stick his head into her daughters' room. She said that she ran toward her neighbor's house and that the defendant hit her on the top of her head from behind with a pipe while she was in her neighbor's yard. She said that she reached her neighbor's porch but that the defendant pulled her down by her hair, caused her to bruise her leg on the concrete, and hit her again with the pipe. She said the defendant dragged her, scraping her knee and leg. She said he hit her arm causing a gaping wound that healed into a two-inch long scar. She said he hit her three to four times in all and said nothing during the attack. She said that her neighbor came outside and that the defendant ran away. She said she was taken to the hospital in an ambulance and remained there until 7:00 a.m. She said that after she returned home, she checked the junction box where her telephone line enters her house and found that the line had been cut.

The victim testified that before the attack, she had last seen the defendant earlier that night at her sister's house. She said that her sister had allowed him to come inside and that he had brought the victim some cigarettes. She said that although she did not ask the defendant for anything, he kept buying her things and would not leave her alone. On cross-examination, she acknowledged that the defendant had knocked on her door earlier that night. She said that Mr. Williams was not there and that Deon Pruitt was at her house using the telephone. She said that she pushed the defendant, told him that he could not come inside, and locked the door. She said that the defendant was no longer there when Mr. Pruitt left. She admitted that at the preliminary hearing, she had testified that she pushed the defendant off her porch. She denied calling the defendant to ask him to bring her some cigarettes. She also said she did not know Samuel Harris.

The victim denied telling an officer that the defendant entered her house from a rear window and hit her repeatedly with a large stick. She acknowledged that the glass was missing from the bottom part of her kitchen window before October 1, and that this section of the window had been covered with a board. She said that a clear sheet of plastic covering the entire window was already there when she moved into the house. She said that the glass in the top of the window was not broken before the night of the attack. Although questioned about her preliminary hearing testimony

in which she said that the defendant first hit her as she was descending her steps, the victim confirmed that she was in her neighbor's yard when he initially struck her.

Officer Mark Headen of the Jackson Police Department testified that on October 1, 2000, he responded to a call at 319 North Lindsey Street. He said that the victim told him that someone had broken into her home and had assaulted her inside her house between the bedroom and the kitchen. He found the victim with severe blunt trauma to her head and defensive wounds to her arms and hands. He said that he called for medical help as soon as he saw her and that she was bleeding and appeared to have been struck repeatedly. He said that the victim told him that she had been hit with a stick or a pipe by her estranged or ex-husband, whom she identified as the defendant. He said that he saw a broken window in the kitchen, which was in the rear of the house. He said that the victim told him that she had to go next door to use the telephone and that she believed that someone had tampered with her power and telephone lines. He said that he checked the victim's junction box, which appeared to have been damaged with a pipe or a stick. He acknowledged that he did not check the junction box or the board on the kitchen window for fingerprints. He said that he did not remember talking with the victim's neighbor. He said that if the victim had told him that the attack occurred in her neighbor's yard and on her neighbor's porch and lasted until the neighbor came outside, he would have spoken with the neighbor.

Officer Headen testified that around 2:00 a.m., he attempted to locate the defendant. He said that the victim had directed him to 166 Union Street, which he believed was the defendant's sister's address, and had told him that the defendant drove a brown van. He said that he found the van at that location but did not find the defendant there despite checking back several times. He said that the police located the defendant in the morning. He said he never checked the defendant's house because he did not know where the defendant lived.

Sergeant Donna Johnson of the Jackson Police Department testified that on October 1, 2000, she responded to a call that someone had broken into 319 North Lindsey and assaulted a female inside. She said she collected evidence from the scene but saw no blood inside the house. She said the police did not find the weapon in the house. She said the kitchen window was broken and the glass had fallen inside onto a sink or cabinet area. She believed that the glass was mostly from the bottom of the window, and she did not examine it for blood. She acknowledged that she did not check the board that was covering the kitchen window for fingerprints even though it had a smooth, painted surface. She said she did not attempt to collect fingerprints from the victim's junction box because its rough surface was not suitable for lifting fingerprints. She said she did not find any blood in the grass, on the sidewalk, or on the victim's porch. She said she did not check the neighbor's porch for blood.

The defendant testified that around 8:45 p.m. on September 30, 2000, the victim called his sister's house and he answered the phone. He said the victim asked him to come to her house and to bring her a package of cigarettes and some money. He said that at 9:05 p.m., he stood on the victim's porch and handed her the cigarettes and forty dollars. He said that he asked her if she could wait until the next day for the money and that she gave back the money and pushed him off her

porch. He said that he was at her house for about five minutes and that he left without asking why she had pushed him. He said that when he left, the victim was uninjured and that Samuel Harris and a man whom the victim called Deon were inside the victim's house. He said that he did not see the victim again until he saw her in court on October 2, 2000. He denied breaking her window, sticking his head into her house through an opening by an air conditioner, or hitting her.

On cross-examination, the defendant admitted that he violated an order of protection by going to the victim's house, but he said that the victim gave him permission to come over. He denied being angry because two men were at the victim's house when he arrived with cigarettes and money for the victim or because the victim told him to leave. He said that after he left the victim's house, he returned to his sister's house and washed clothes until 10:30 p.m. He said he then went to the laundromat for thirty-five minutes to dry his clothes. He said that after going to his house to dress, he parked his van at his sister's house and walked to the Poison Apple Club. He said he arrived at the club at 12:00 or 12:30 a.m. and stayed until it closed at 3:10 a.m. He said that while there, he spoke with some people he knew. He acknowledged that none of those people had come to court to testify that he was at the club that night.

The jury acquitted the defendant of aggravated burglary and destruction of a utility line. It convicted him of aggravated assault while enjoined by an order of protection and aggravated assault with a deadly weapon. The trial court merged the two aggravated assault convictions.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to convict him of either count of aggravated assault. With respect to count two, aggravated assault while enjoined by a court order, he argues that the proof is not sufficient to show that he was the one who committed the assault. Regarding count three, aggravated assault with a deadly weapon, he argues that no evidence existed that he possessed a blunt object, that it constituted a deadly weapon, or that the victim suffered serious bodily injury. Finally, he argues that the variation between the victim's testimony and her account of the offense to the police coupled with the presence of two men in the victim's house created reasonable doubt. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Aggravated assault as charged in count two of the indictment is the intentional or knowing attempt to cause or the causing of bodily injury or the attempted or actual assault of an individual

"after having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against" the individual. Tenn. Code Ann. § 39-13-102(c). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Id. § 39-11-106(a)(2). Aggravated assault as charged in count three of the indictment is intentionally or knowingly causing bodily injury to another while using or displaying a deadly weapon. Id. § 39-13-101(a)(1), -102(a)(1)(B). A deadly weapon is in pertinent part anything that "in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-11-106(a)(5)(B). Serious bodily injury is bodily injury involving "(A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." Id. § 39-11-106(a)(34).

Viewing the evidence in the light most favorable to the state, the victim testified that the defendant struck her on the head and arm with a pipe. She said that he bruised and scraped her leg by pulling her from her neighbor's porch and dragging her. Officer Headen testified that the victim had suffered severe blunt trauma and was bleeding. The photographs introduced at trial show bloody wounds at her hairline and on the top of her head, a gaping cut on her arm, and an abrasion on her knee and leg. The order of protection reveals that the Madison County General Sessions court had enjoined the defendant from injuring the victim. This order was in effect on October 1, 2000. The evidence is sufficient to convict the defendant of aggravated assault while enjoined by a court order.

The evidence also supports the defendant's conviction of aggravated assault with a deadly weapon. The victim testified that the defendant hit her with a pipe. Although the victim indicated the length and diameter of the pipe, her demonstration was not preserved in the record. The victim testified that the defendant hit her three or four times and stopped hitting her when her neighbor came outside. A pipe used to strike a victim on the head is capable of causing death or serious bodily injury. See, e.g., State v. Donald Lynn Miller, No. E1999-00148-CCA-R3-CD, Knox County (Tenn. Crim. App. Jan. 30, 2001) (holding the evidence of especially aggravated robbery was sufficient when victim was struck on the head with a deadly weapon, i.e., a metal pipe). The defendant's argument that the state had to show that the present victim suffered serious bodily injury is misplaced. The evidence needs only to be sufficient to show that the victim suffered bodily injury and that the defendant used a deadly weapon.

The defendant argues that the discrepancy between the victim's testimony and her account of the offenses to the police along with the evidence that two other men were at her house that night create reasonable doubt. The differences in the victim's description of her attack to the police and her testimony at trial go to the victim's credibility, a matter reserved for the trier of fact and not this court. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The jury chose to accredit the state's theory of the offense as is its prerogative. The evidence is sufficient to support the defendant's aggravated assault conviction.

## II. ELECTION

The defendant also contends that the trial court erroneously failed to require the state to elect between the two counts of aggravated assault. In support of this argument, he relies upon State v. Brown, which holds that "when the evidence indicates that the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." 992 S.W.2d 389, 391 (Tenn. 1999). The primary purpose behind requiring the state to elect a particular offense is "to ensure that the jurors deliberate over and render a verdict based on the same offense." Id. The state contends that the present case presents no danger of a patchwork verdict because it involves two counts charging separate theories of aggravated assault and the jury was instructed to consider each count separately. We agree with the state that the election requirement does not apply to these circumstances.

The courts of this state have repeatedly held that when evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the state to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). "This election requirement serves several purposes":

> First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). The requirement of election and a jury unanimity instruction exists even though the defendant has not requested them. See Burlison, 501 S.W.2d at 804. Moreover, failure to follow the procedures is considered to be of constitutional magnitude and will result in reversal of the conviction absent the error being harmless beyond a reasonable doubt. See Adams, 24 S.W.3d at 294; see, e.g., Shelton, 851 S.W.2d at 138.

"When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." Adams, 24 S.W.3d at 294 (discussing that no election is required for continuing offenses). Consequently, the trial court may properly submit to the jury multiple counts embodying different theories for committing a single offense. See State v. Lemacks, 996 S.W.2d 166, 171-72 (Tenn. 1999) (holding that no election was required by proving alternative theories of guilt for one offense of driving under the influence of an intoxicant); State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998) (holding that counts alleging premeditated and felony murder may be submitted to the jury for a single murder).

In the present case, no danger of a patchwork verdict existed because the trial court required the jury to consider separate counts of aggravated assault. Thus, there is no chance that the jurors reached their verdict on either count based upon different facts. Additionally, the transcript reveals that the state conceded and the trial court intended to merge the two counts should both result in a conviction. The trial court did not err in refusing to require the state to elect between the two counts of aggravated assault.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE