# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Remanded by the Supreme Court May 26, 2011

## STATE OF TENNESSEE v. MARTHA PATLAN

### Direct Appeal from the Criminal Court for Davidson County
### No. 2006-D-3184    Steve R. Dozier, Judge

---

### No. M2011-01175-CCA-RM-CD - Filed July 18, 2011

---

This case is before this court upon the Tennessee Supreme Court's remand for further consideration in light of its opinion in *State v. Dorantes* (*Dorantes II*), 331 S.W.3d 370 (Tenn. 2011).  A Davidson County jury convicted the defendant, Martha Patlan, of aggravated child abuse, a Class A felony, and first degree felony murder during the perpetration of aggravated child abuse.  The trial court sentenced the defendant to a mandatory sentence of life imprisonment for the murder conviction and, consecutive to the life sentence, twenty years for the aggravated child abuse conviction both to be served in the Tennessee Department of Correction.  On appeal, the defendant argued that (1) the evidence was insufficient to convict her of aggravated child abuse and felony murder; (2) her felony murder conviction is unconstitutional; (3) the trial court erred when it failed to require the state to elect an incident of neglect; (4) the trial court erred when it refused to allow testimony regarding bruises on the defendant's face; (5) the trial court erred when it allowed certain photographs into evidence; (6) the trial court erred in overruling the defendant's objection to the use of the term Battered Child Syndrome; and (7) the trial court erred by ordering that the defendant serve her sentences consecutively.  This court affirmed the defendant's convictions and sentences.  Upon review, we again conclude that the evidence was sufficient to support the defendant's convictions and that the defendant's sentence is proper.  Accordingly, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Paula Ogle Blair (on appeal), and Paul Walwyn, Ross Alderman, District Public Defender, and Amy Harwell, Assistant Public Defender, Nashville, Tennessee, for the appellant, Martha Patlan.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin Miller and Brian Holmgren, Assistant District Attorneys General, for the appellant, State of Tennessee.

## OPINION ON REMAND

On June 17, 2003, a Davidson County grand jury indicted the defendant, Martha Patlan, and her co-defendant, Genaro Edgar Espinosa Dorantes, for aggravated child abuse, a Class A felony, and first degree felony murder during the perpetration of aggravated child abuse. The grand jury returned a superseding indictment on December 17, 2006, which charged the defendant with three counts of first degree felony murder and one count of aggravated child abuse. Before trial, the court dismissed two of the felony murder charges. The defendant's jury trial began on April 9, 2007. During the trial, the parties presented the following evidence, as summarized by this court's opinion in the co-defendant's direct appeal:

On the morning of February 23, 2003, the body of a four-year-old child was found in a park in Nashville, Tennessee. After being alerted by a jogger in the park, Officer Jerry Moore with the Metropolitan Park Police located the child's body behind an earthen mound between 8:30 a.m. and 8:45 a.m. Officer Moore drove to the area, secured the scene, and called for a detective on his radio. The body was later identified as [L.C.][1], the victim in this case.

Jose Luis Cisneros Servantes ("Jose"),[FN1.] [the defendant]'s husband, testified that he and the [defendant], along with their other three children, lived in Mexico when the victim was born. After Jose and the [defendant] separated, Jose left the children with his wife and moved to Houston, Texas. In 2001, Jose took the children from Mexico and moved them to Texas with him. In June 2002, while the victim was at Jose's home in Texas, the victim "went missing." Jose never saw his son alive again. Jose stated that the victim was physically "one hundred percent normal and healthy," did not have any mental difficulties, and did not wear diapers before he disappeared. Jose identified a photograph of the victim taken prior to his death which was admitted into evidence.

[FN1.] Due to several witnesses having similar names, some of the witnesses will be referred to by their first or middle name. No disrespect is intended by this format.

---

[1] It is this court's policy to refer to minor victims by initials only.

On cross-examination by [the defendant]'s counsel, Jose testified that he went to Nashville to search for the victim approximately two months after he disappeared. Jose stated that the children were originally with his wife in Mexico before they moved to Houston with him.

Martha Bernece Cisneros Patlan ("Bernece"), [the defendant]'s and Jose's oldest child, testified that she was present when [the defendant] took the victim from their father's residence in Texas. Bernece stated that [the co-defendant] was with [the defendant] at the time the victim was taken. She saw [the defendant] put the victim in a black car, which was the last time she had seen the victim alive. Bernece identified both [the defendant] and [the co-defendant] in open court at trial.

On cross-examination by [the co-defendant]'s counsel, Bernece testified that she did not know [the co-defendant's] identity at the time the victim was taken. Bernece was only able to identify [the co-defendant] after she saw photographs of [the co-defendant] on the news and learned of the victim's death several months later.

Antonia Patlan ("Antonia"), [the defendant]'s sister, testified that in February of 2003, [the defendant] came to her apartment in Nashville and asked for money. [The defendant] told her that she needed the money "to buy a cream because [the victim] had been burned." [The defendant] told Antonia that the victim "had burned himself with some corn cobs that she was cooking." Antonia gave [the defendant] forty dollars to buy the medicine. A week later, [the defendant] returned to Antonia's apartment to store some items and told Antonia that she was going on a trip. Antonia then asked to see the victim, who was waiting inside a white van driven by [the co-defendant]. Upon seeing the victim, Antonia touched his head and asked "what happened to you, my child?" She was unable to understand the victim's response. Antonia stated that the victim appeared to be sitting "in a position like maybe not to hurt himself," protecting his buttock area. [The co-defendant] then said, "'Let's go, let's go woman, let's go, woman.'" Antonia stated that she could not distinguish the color of the victim's clothes at the time because it was dark outside. She only remembered that he was fully clothed in dark clothing and did not see his feet.

On cross-examination by [the co-defendant's] counsel, Antonia testified that [the defendant] and her family traveled frequently and never rented an apartment or stayed in one place. On cross-examination by [the defendant]'s counsel, Antonia testified that [the defendant] seemed concerned and worried

when she asked for the money to buy the medicine for the victim and that [the co-defendant] was in a hurry to leave for the trip.

Maria Patlan-Cano ("Maria"), [the defendant]'s other sister, testified that she observed the victim's appearance while he was in Mexico and in Nashville. While in Mexico, the victim was "chubbier" and "very happy." When Maria saw him in Nashville, the victim was "very thin and very crestfallen." Maria stated that on February 20, 2003, [the defendant] came to her job crying and asking for money because the victim was very sick and needed medicine. Maria stated that [the defendant] told her that the victim had been burned from corn on the cob and that she was very afraid that he was going to die. Maria went outside and asked to see the victim, who was inside a white van driven by [the co-defendant]. [The co-defendant] declined her request, stating that he had to move the van because he was blocking traffic. After [the co-defendant] moved the van away from traffic, Maria went into the van. Upon entry, she screamed "why was the child like this, why was the child like that?" Maria stated that the victim did not move when she called his name. She noticed that the victim was "very skinny" and that his foot was bandaged. [The defendant] then told Maria to leave the vehicle because [the co-defendant] was angry. While [the defendant] was crying, [the co-defendant] told [the defendant] to get in the van. As Maria was getting out of the van, the van began to move. Maria stated that she was able to get the license plate number of the van to give to the police. In a photograph taken of the victim at the park, Maria identified the victim's body and stated that he was wearing the same clothes when she saw him on February 20, 2003.

On cross-examination by [the defendant]'s counsel, Maria testified that [the defendant] was scared when [the co-defendant] became angry at her. She stated that [the co-defendant] asked her (Maria) to leave the van when she was asking questions about the victim.

Maria was recalled to testify by the State. She testified that she asked [the co-defendant] why he did not give the victim any medicine or take the victim to the doctor. [The co-defendant] replied that "since he wasn't [the victim's] father he didn't have any reason to want to make [the victim] get better." Maria then asked [the co-defendant] why he took the victim away from his father. [The co-defendant] said that "he didn't want to bring [the victim] but that [expletive referring to [the defendant]] wanted it to happen."

-4-

On cross-examination by [the co-defendant's] counsel, Maria acknowledged that she did not mention the above conversation with [the co-defendant] in her sworn affidavit.

Juan Sanchez ("Juan"), Maria's brother-in-law, testified that Maria asked him to call the police after her encounter with [the co-defendant] and [the defendant]. Juan also officially identified the victim's body when it was found in the park.

Keith Sutherland, a detective with the Metropolitan Nashville Police Department, testified that fugitive extradition warrants were issued for [the co-defendant] and [the defendant]. Detective Sutherland stated that he assisted in transporting [the co-defendant] and [the defendant] from Mexico back to Nashville.

Sara Bruner, a detective with the Youth Services Division of the Metropolitan Nashville Police Department, testified that she was assigned to investigate the victim's death. She received a report taken by patrol officers that some children were "in poor condition" and "in a state of shock". On February 21, 2003, as part of Det. Bruner's investigation, she telephoned Juan Sanchez whose number was listed in the report. Based on her conversation with Sanchez, Det. Bruner issued a notice to other police officers to be on the look out for the van [the co-defendant] and [the defendant] were driving. Days later, Det. Bruner learned that the victim was found dead in a park. She stated that [the co-defendant] and [the defendant] were the only suspects in the case. In 2006, Det. Bruner learned that [the defendant] was in Mexico.

Brad Corcoran, a detective with the Homicide Division of the Metropolitan Nashville Police Department, testified that he responded to a call that a child's body was found in West Park. Detective Corcoran stated that the victim's body "appeared [as though] it had been placed [in the park] rather than [having] walked there" because the victim did not have any debris on the bottom of his socks and there was no debris or vegetation around the victim that had been moved. He noticed that the body was fully clothed except for shoes or a jacket. Detective Corcoran stated that the body was behind a dirt mound and would not have been seen by anyone from the road or the park's parking lot. Detective Corcoran concluded that the body had not been there long because it had snowed the night before, and no snow was present on the body. There were also several people present in the park on the previous day. On February 24, 2003, [the co-defendant] and [the defendant] were named as suspects, and warrants were issued for their arrest. After approximately three

years of media coverage and tips, [the co-defendant] and [the defendant] were arrested in Mexico and brought back to Nashville.

Carla Aaron with the Department of Children's Services testified that all caregivers are responsible for providing proper nutrition, medical treatment, and a safe environment for a child. After becoming aware of the victim's death, Aaron inquired about past complaints involving the victim and his siblings, but none were found. She testified that if a medical provider had seen the victim's condition, the provider should have reported it to the Department of Children's Services.

Amy R. McMaster, the Deputy Chief Medical Examiner for Davidson County and a practicing physician, testified that on February 24, 2003, she performed an autopsy of the victim's body. Dr. McMaster outlined the injuries sustained by the victim that were consistent with child abuse. The external examination of the victim revealed "multiple injuries of varied ages over virtually every surface of [the victim's] body." The victim had bandages wrapped around his feet and was wearing a diaper. Dr. McMaster concluded that the diaper was used to absorb blood caused by scabbing over burns that were on his buttocks and genitals. She explained the victim had sustained extensive burn injuries to his feet, buttocks, scrotum, and penis. The burn injuries were consistent with the victim having been intentionally placed in water over 150 degrees by an adult caregiver. She stated that the burns were inconsistent with injuries caused by cooking corn cobs. The burns to the victim's feet would have prevented him from walking and the burns to his buttocks would have prevented him from sitting comfortably. The burns were from a couple of days to a couple of weeks old. Dr. McMaster stated that the victim had sustained scars on his face and multiple bruises and puncture wounds on other areas of his body. The puncture wounds were consistent with having been poked with "some type of pointed instrument." The injuries on the skin were at different stages of healing.

Examination of the victim's internal injuries revealed that he had sustained blunt trauma to his brain and skull. Changes to his organs "suggested [that] he had an infection throughout his body." Dr. McMaster stated that the victim had "fluid that accumulated in different body spaces, which could indicate that because of the infection or for other reasons his organs began to fail," and that he would have died from the infection. Dr. McMaster stated that the most significant injury to the victim was the blunt force trauma to his head consisting of an abrasion on a portion of his left ear, a skull fracture, and bleeding around the brain caused by something striking his head. The swelling

-6-

of the victim's brain indicated that the brain injuries were more recently sustained. Dr. McMaster stated that the victim likely died within "a couple of hours after the head injury was inflicted." She opined that the blunt force head trauma was "non-accidental." She reasoned that the victim "was not able to get up and walk around, interact with his surroundings. [The victim] basically, from his burns, would have been immobile. He would have been . . . lying [sic] in one place. So there's really no mechanism for him getting this blunt trauma to his head unless it's inflicted by another individual." She further opined that bruises found on the victim's right hand possibly indicated that he attempted to protect his head or other body parts from the blunt force trauma. Dr. McMaster also discovered an old contusion on the right side of the victim's brain, indicating that he had previously sustained blunt force head trauma.

In order to assist the medical examiner in explaining the autopsy, the following photographs of the victim's body illustrating his injuries were admitted into evidence and displayed to the jury: (1) a photograph of the victim's lower back, Exhibit No. 7-E; (2) a photograph of the burns on the victim's back, buttocks, right hand, and elbow, Exhibit No. 7-O; (3) a photograph of the burns on the victim's buttocks, legs, and feet, Exhibit No. 7-P; (4) a photograph of the burns on the victim's legs and feet, Exhibit No. 7-J; (5) a photograph of the burns on the victim's right leg and foot, Exhibit No. 7-N; (6) a photograph of the burns on the bottom of the victim's left foot, Exhibit No. 7-X; and (7) a photograph of the injury to the victim's elbow, Exhibit No. 7-R.

Dr. McMaster also testified that the victim's injuries indicated that he had been physically neglected. She stated that the victim had untreated, infected burns on his body, and the bacteria from these infections had spread throughout his body. She also stated that the victim was "very thin" and "malnourished . . . . [H]is ribs were very easily seen beneath his skin." At the time of the victim's death, he weighed thirty-four pounds with "just a little bit of thick fluid" in his stomach. Dr. McMaster did not recall examining the victim's colon or large bowel contents to determine if he had recently eaten. Despite the victim's blunt trauma to his head, Dr. McMaster stated the victim would have died if the infections from the burns remained untreated. Based on the combination of these injuries, Dr. McMaster concluded the victim's cause of death was Battered Child Syndrome, "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse." The term is also used to characterize injuries involving neglect. Dr. McMaster stated that the manner of the victim's death was homicide.

Neither [the co-defendant] nor [the defendant] presented any proof at trial.

*State v. Genaro Edgar Espinosa Dorantes* (*Dorantes I*), M2007-01918-CCA-R3-CD, 2009 WL 4250431, at *1-6 (Tenn. Crim. App., at Nashville, Nov. 30, 2009), *aff'd in part, rev'd rev'd in part* 331 S.W.3d 370(Tenn. 2011).

After hearing the evidence, the jury convicted the defendant of felony murder and aggravated child abuse. The court held a sentencing hearing on May 25, 2007, and it affirmed the defendant's mandatory life sentence with the possibility of parole for the felony murder conviction and sentenced the defendant to a consecutive twenty-year sentence for the aggravated child abuse conviction.

The defendant's trial counsel did not file a timely motion for new trial. Trial counsel and the state submitted an agreed order for the trial court to hear the untimely motion for new trial; however, the trial court denied the motion.

The defendant filed a petition for post-conviction relief on April 8, 2008, alleging that her trial counsel was ineffective for failing to file a motion for new trial and notice of appeal. The court appointed post-conviction counsel and the post-conviction court granted the defendant's request for a delayed appeal. The defendant filed her motion for new trial, and the trial court denied the motion. The defendant now appeals.

**Analysis**

On appeal, the defendant argues that (1) the evidence was insufficient to support her aggravated child abuse and felony murder convictions; (2) her felony murder conviction is unconstitutional; (3) the trial court erred when it failed to require the state to elect an incident of neglect; (4) the trial court erred when it refused to allow Maria to testify regarding bruises on the defendant's face; (5) the trial court erred when it allowed certain photographs into evidence; (6) the trial court erred in overruling the defendant's objection to the use of the term Battered Child Syndrome as the cause of the victim's death; and (7) the trial court erred by ordering that the defendant serve her sentences consecutively.

*1. Sufficiency of the Evidence*

The defendant argues that the record is insufficient to support both her conviction for first degree felony murder based on aggravated child abuse and her conviction for aggravated child abuse. Regarding her aggravated child abuse conviction, the defendant contends that "the evidence was insufficient for the trier of fact to find that [she] purposely caused injury to the victim, that she neglected the victim's injuries, or that she acted with [the co-defendant]

in neglecting or abusing the victim." She further contends that because the evidence was insufficient for the jury to convict her of aggravated child abuse, the evidence was insufficient to convict her of felony murder based on aggravated child abuse.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers,* 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans,* 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers,* 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid,* 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See Dorantes II*, 331 S.W.3d at 381 (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

*A. Aggravated Child Abuse*

To sustain the defendant's conviction for aggravated child abuse, the state had to prove that the defendant committed the offense of child abuse or neglect, and the conduct resulted in serious bodily injury to the child. *See* Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id*. § 39-15-401(a). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." *Id*. § 39-11-106(a)(2). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id*. § 39-11-106(a)(34)(A)-(E).

The Tennessee Supreme Court, in *State v. Mateyko*, 53 S.W.3d 666, 668 n. 1 (Tenn. 2001), described the child abuse and neglect statute as a single offense which a defendant may commit "through one of two courses of conduct: child abuse through injury and child abuse through neglect." (citing *State v. Hodges,* 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998)). Similarly, the state may establish aggravated child abuse by either of these methods, in addition to serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1) (Supp. 2002); *Hodges,* 7 S.W.3d at 622-23; *State v. Ducker*, 27 S.W.3d 889, 895-96 (Tenn. 2000). More specifically, in *Hodges*, this court held that the term "child abuse," as charged in an indictment, also included child neglect. *Hodges,* 7 S.W.3d at 622-23. The *Hodges* court reasoned that "[c]hild abuse as defined in § 39-15-401 encompasses § 39-15-401(a) in its entirety[.]" *Id*. at 623. Additionally, this court has concluded that "the legislature fully intended for aggravated child abuse to include child abuse through neglect that results in serious [bodily] injury. The language of the statute supports such an interpretation." *State v. John and Rita Adams*, No. 02C01-9707-CR-00246, 1998 WL 389066, at *4 (Tenn. Crim. App., at Jackson, July 14, 1998), *aff'd*, 24 S.W.3d 289 (Tenn. 2000); *but see State v. Denise Maupin*, No. 272, 1991 WL 197420, at * 5 (Tenn. Crim. App., at Knoxville, Oct. 7, 1991), (stating that child abuse as proscribed in a child abuse murder statute did not include child neglect) *aff'd*, 859 S.W.2d 313 (Tenn. 1993).

A defendant "is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39–11–401(a). "Each party to an offense may be charged with commission of the offense." Tenn. Code Ann. § 39–11–401(b). Criminal responsibility, is an alternative theory under which the state may establish the defendant's guilt based upon the conduct of another. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant may be held criminally responsible for an offense committed by the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense [.]" Tenn. Code Ann. §

39–11–402(2). An individual's participation may be inferred from presence and companionship with the perpetrator of a felony before and after the commission of the crime. *See State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). Moreover, the state is not required to demonstrate any specific act or deed. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). The criminal responsibility statute "is a restatement of the principles of Tennessee common law which provide equal criminal liability for principals, accessories before the fact, and aiders and abettors." *State v. Carson*, 950 S.W.2d 951, 953 (Tenn. 1997) (citation omitted). The jury is not obligated "to determine unanimously whether a defendant is either directly liable or criminally responsible for the harm inflicted. *Dorantes II*, 331 S.W.3d 370, 389 (Tenn. 2011) (quoting *State v. Nunn*, No. E2007–02333–CCA–R3–CD, 2009 WL 4790211, at *25 (Tenn. Crim. App., at Knoxville, Dec. 14, 2009), *perm. app. denied* (Tenn. 2010)).

The proof at trial, viewed in the light most favorable to the state, established that the defendant and co-defendant abducted the victim on June 18, 2002 and shared physical custody of the victim until his death. It is undisputed that the victim was under eight years old and suffered serious bodily injury. The medical examiner's autopsy showed that the victim suffered second and third degree burns within two weeks of his death as the result of being immersed in scalding hot water, buttocks and feet first, in a fetal-like position. Dr. McMaster, who conducted the autopsy, concluded that the burns could not have been accidental. In addition to the burns, the victim's skull was fractured from blunt force trauma. Dr. McMaster likewise concluded that the blow to the victim's head could not have been accidental because of a wound to the victim's right hand that was consistent with the victim trying to protect himself from attack. The autopsy concluded that the immediate cause of death was blunt trauma injury to the brain and skull; however, Dr. McMaster stated that the infections from the burns would have inevitably been fatal without medical treatment.

During the time of his abuse and up to his death, the victim was in the exclusive care of the defendant and co-defendant. The victim was visibly injured and in need of medical attention. The co-defendant and the defendant knew that the victim needed medical attention, yet neither of them sought medical treatment for the victim. When asked why he did not take the child to the doctor, the co-defendant stated, "since he wasn't [the victim's] father he didn't have any reason to want to make [the victim] get better." The co-defendant further stated that the defendant had wanted to take the victim from Texas, and he did not. There was no evidence that the co-defendant coerced the defendant or that the defendant attempted to report the abuse or otherwise prevent the victim from being further abused. Likewise, the defendant never reported that the co-defendant was abusing her. Instead, whenever someone expressed

concern about the victim's condition, the defendant provided excuses, which the medical testimony refuted, and fled with the co-defendant. When speaking with her sisters, the defendant asked for money allegedly for medicine to treat the victim's injuries and told Antonia she was going on a trip, but she never indicated that she was abused, held captive against her will, or afraid of the co-defendant. Moreover, after the victim's death, the defendant fled to Mexico with the co-defendant where they hid out and evaded arrest for nearly three years. "[F]light and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt." *State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985).

We conclude that the circumstantial evidence presented to the jury created a "reasonable inference that the defendant either knowingly, other than by accidental means, committed aggravated child abuse as the primary actor or, at a minimum, intentionally solicited, directed, aided, or attempted to aid the co-defendant in the commission of the offenses." *Dorantes II*, 331 S.W.3d at 387-8 (citing Tenn. Code Ann. § 39–11–402(2)). "[P]hysical participation in the crime is not an essential element under the criminal responsibility theory; encouragement of the crime is enough." *Id*. at 388. Thus, we conclude that the evidence was sufficient for the jury to find the defendant guilty of aggravated child abuse through injury under a theory of criminal responsibility.

Furthermore, even if we did not find the defendant criminally responsible for the co-defendant's behavior, the facts presented by the state support the jury's verdict of guilty for the aggravated child abuse based upon the defendant's neglect of the victim, which adversely affected the victim's health and welfare and resulted in serious bodily injury. *See* Tenn. Code Ann. §§ 39-15-401, -402. The defendant knew that the victim had burns on his body and needed treatment. The evidence is clear that the victim's injuries were obvious, and he was visibly in need of medical attention. The defendant's sisters testified that upon viewing the victim they became concerned with his health. Antonia stated that when she saw the victim in the van, he appeared to be sitting in a position which protected his buttocks and would not hurt. Maria testified that the victim was unresponsive, "very skinny," and had a bandaged foot when she saw him. The medical examiner testified that the victim was physically neglected. She stated that the victim's burns were infected, which indicated they were between two days to two weeks old. Further, the evidence showed that the defendant was aware that the victim needed medical treatment and sought money allegedly for treatment, but there was no evidence that the defendant ever took the victim to a doctor, a hospital, or even purchased the medicine for which she allegedly sought money. Thus, we conclude that the evidence, even though entirely circumstantial, is sufficient to support the jury's finding of the defendant's guilt beyond a reasonable doubt of aggravated child abuse.

*B. Felony Murder*

The Tennessee General Assembly amended the felony murder statute, effective July 1, 1998, by adding aggravated child neglect to the list of felonies upon which a felony murder charge could be based: "First degree murder is: . . . (2) A killing of another in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" *Dorantes II*, 331 S.W.3d at 383 (citing Act of Apr. 29, 1998, ch. 1040, § 3, 1998 Tenn. Pub. Acts 911 (codified at Tenn. Code Ann. § 39-13-202(a) (Supp.1998)). In amending the statute, the General Assembly provided "two separate and distinct courses of conduct, aggravated child abuse and aggravated child neglect, upon which a felony murder may be predicated." *Id*. at 384. Thus, charging a defendant with murder in the perpetration of aggravated child abuse does not charge murder in the perpetration of aggravated child neglect. *Id.* (citing *Dorantes I*, 2009 WL 4250431, at *17 (Tipton, P.J., dissenting)).

Upon finding that the evidence supports the aggravated child abuse conviction under a theory of criminal responsibility, we conclude that the evidence was also sufficient to enable a rational trier of fact to find the defendant guilty of first degree felony murder. There is no question that a killing has occurred within the meaning of Tennessee Code Annotated section 39-13-202(a)(2). Although the state could not prove which of the two defendants administered the fatal injuries, there can be no mistake that an act of abuse resulted in serious bodily injury within the meaning of Tennessee Code Annotated section 39-15-402(a)(1) while the victim was in the defendants' care. The evidence presented at trial showed that Battered Child Syndrome caused the victim's death. Although the victim died within a few hours of the blunt force trauma to his head, Dr. McMaster stated that the victim would have eventually died if the infections from the burns remained untreated. The record shows that the evidence presented by the state supported the jury's guilty verdict for the felony murder committed during the perpetration of aggravated child abuse. Accordingly, the defendant is not entitled to relief on this issue.

*2. Constitutionality of the defendant's felony murder conviction*

The defendant contends that her conviction for felony murder under Tennessee Code Annotated section 39-13-202 is unconstitutional because the statute "deprives the accused the right to a trial by jury as guaranteed by the United States and Tennessee Constitutions." In *State v. Godsey*, the Tennessee Supreme Court rejected the claim that our felony murder "statute violates due process by failing to include a culpable mental state." 60 S.W.3d 759, 773 (Tenn. 2001). Under Tennessee law, the felony murder doctrine requires that the state prove that the defendant committed the underlying felony with the applicable culpable mental state, and the doctrine allows the transfer of that culpability to the homicide. *Id*. "[W]here the offense is committed in the perpetration of a designated felony, the elements of malice, deliberation and premeditation are implied." *State v. Middlebrooks*, 840 S.W.2d 317, 336 (Tenn. 1992) (citing *State v. Barber*, 753 S.W.2d 659, 671 (Tenn.1988); *State v. Norris*, 684

-13-

S.W.2d 650, 653 (Tenn. Crim. App. 1984)) *superseded by statute as stated in State v. Reid*, 91 S.W.3d 247, 306 (Tenn.2002). Thus, our supreme court has determined that the transfer of the culpable mental state, which our felony murder statute allows, is constitutional. *Godsey*, 60 S.W.3d at 773. Published precedent binds us, and, therefore, we conclude that the defendant's felony murder conviction is constitutional. *See* Tenn. S. Ct. R. 4(G)(2) ("Opinions reported in the official reporter, however, shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."). The defendant is not entitled to relief on this issue.

### *3. Failure of trial court to require the state to elect an incident of neglect*

The defendant argues that the trial court committed an error when it failed to require the state to elect which injury or event it relied upon to convict the defendant for neglect. The defendant contends that the trial court's failure deprived her of the fundamental right to a unanimous jury verdict.

Our supreme court has held that where a defendant commits multiple offenses against a victim, the state has a duty to elect which act or occurrence relates to which particular charged offense for which the state seeks a conviction. *State v. Adams,* 24 S.W.3d 289, 294 (Tenn. 2000). The court, in *Adams*, elaborated upon the purposes of election in the following manner:

> First, [election] ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. [*State v.*] *Brown*, 992 S.W.2d [389, 391 (Tenn. 1999)]; [*State v.*] *Burlison*, 501 S.W.2d [801, 803 (Tenn. 1973)]. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately touching on the constitutional rights of an accused . . . ." *Burlison*, 501 S.W.2d at 804.

*Id.* Additionally, our supreme court has noted that:

> election at the end of the state's proof does little to aid the defendant in preparing his defense. A defendant is obviously better served by requesting a bill of particulars before trial . . . . The third *Burlison* rationale addresses the most serious concern: the well-established right under our state constitution to a unanimous jury verdict before a criminal conviction is imposed. For this

reason, when evidence suggests that a defendant has committed many . . . crimes against a victim, the court must require the state to elect the particular offenses for which convictions are sought.

*State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)(internal citations omitted).  When the evidence does not establish that multiple offenses were committed, the need for election never arises.  *Adams*, 24 S.W.3d at 294.  Likewise, "[i]n cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense."  *Id.*

The offense of aggravated child abuse through neglect is a continuing course of conduct.  *See id*. at 296.  (holding that "the General Assembly intended for the offense of aggravated child abuse through neglect to punish a continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare").  "Child abuse through neglect continues 'until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect.'"  *Mateyko,* 53 S.W.3d at 671 (quoting *Adams,* 24 S.W.3d at 296).

Given the defendant's knowledge and awareness of the victim's obvious physical injuries, as stated in Section 1 above, her decision to knowingly forego medical treatment, at whatever point in time she made it, was child neglect.  This neglect continued until the victim ultimately died.   In this case, the defendant's neglect was "continuous and without interruption," and we cannot break the defendant's conduct into "separate and discrete periods of time and space."  *Adams,* 24 S.W.3d at 297.  Accordingly, we conclude that the state was not required to make an election of offenses, and the trial court did not commit an error in failing to require the state to make an election.

It does not appear that the defendant also challenges the trial court's failure to require the state to make an election of offenses regarding the felony murder count.  To ensure a thorough review, however, we have reviewed the issue and conclude that election was not required in this case.  A defendant convicted of felony murder by aggravated child abuse "could only have been convicted of the same offense: a killing committed in perpetration of or attempt to perpetrate aggravated child abuse . . . ."  *Hodges,* 7 S.W.3d at 624.  Presenting alternative means for culpability for one offense does not threaten the defendant's constitutional rights.  *Id.*   Under the law at the time of the instant offense, the state was not required to elect a theory of prosecution.  *See id.* at 625.  Thus, the defendant is not entitled to relief on this issue for either count.

*4. Testimony regarding bruising on the defendant's face*

The defendant contends that the trial court erred when it refused to allow the defense to question Maria about the bruises which she observed on the defendant's face. The defendant claims that the testimony about the bruises on her face was "relevant to show her state of mind and/or duress." The defendant further claims that the trial court's not allowing the testimony regarding the defendant's bruises deprived her of presenting a defense of duress.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *State v. Porterfield,* 746 S.W.2d 441, 450 (Tenn. 1988). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." *State v. Leach,* 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Carruthers,* 35 S.W.3d at 577).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

In a jury out hearing, the trial court ruled that Maria's testimony regarding bruises on the defendant's face neither showed that the defendant was under duress or afraid nor that the co-defendant caused the bruises. Thus, the trial court ruled that the testimony was irrelevant. We agree. There was no evidence that the co-defendant caused the bruises. Maria testified that the defendant was afraid that something would happen to *Maria*, and there was no evidence that the defendant was afraid for her own safety. Maria's testimony regarding the bruising on the defendant's face showed nothing more than the fact that the defendant had bruises when Maria saw her.

We now turn to whether the trial court's exclusion of testimony regarding bruises on her face denied the defendant the right to present the defense of duress. In *State v. Brown,* 29 S.W.3d 427, 432 (Tenn. 2000), our supreme court recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." In *State v. Kiser,* 284 S.W.3d 227 (Tenn. 2009), our supreme court noted the limits of its previous ruling, stating:

> We also recognized in *Brown*, however, that a defendant's right to present witnesses is not absolute. [*Brown*, 29 S.W.3d at 432]. Rather, "[i]n the exercise of this right, the accused, as is required of the State, must comply with

established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 . . . (1973).

*Kiser*, 284 S.W.3d at 267. In determining whether the exclusion of evidence violated a defendant's right to present a defense, this court must "consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Brown,* 29 S.W.3d at 433-34 (citing *Chambers,* 410 U.S. at 298-301.).

In our view, Maria's testimony that the defendant had bruises on her face was not critical to her defense. There was no evidence the defendant was afraid of the co-defendant, that the co-defendant coerced her, or that the co-defendant caused the bruises. The bruises on her face alone would not show that the defendant was under duress or provide any insight as to her complicity in the crimes. Therefore, we conclude that the trial court did not abuse its discretion in preventing Maria from testifying about the bruises on the defendant's face.

*5. Admission of photographs into evidence*

The defendant argues that the trial court erred in allowing the state to introduce certain photographs of the victim's body because "they were not relevant to prove any fact at issue in this case," and their sole purpose was to inflame the jury. The state asserts that the defendant waived the issue by failing to include the objectionable photographs in the record on appeal. In the alternative, the state contends that it used the photographs to show "the nature of the injuries inflicted upon the victim." Thus, the state asserts that they were "highly relevant," and their probative value outweighed the risk of unfair prejudice.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *Porterfield,* 746 S.W.2d at 450. "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." *Leach,* 148 S.W.3d at 63 (citing *Carruthers,* 35 S.W.3d at 577.).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

Rules 401 and 403 of the Tennessee Rules of Evidence govern admissibility of photographs. *See State v. Banks,* 564 S.W.2d 947, 949-951 (Tenn. 1978). The trial court must first determine whether the photograph is relevant to an issue that the jury must decide. Tenn. R. Evid. 401; *see also State v. Cole,* 155 S.W.3d 885, 912 (Tenn. 2005). The trial court must then apply Rule 403 to determine whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice." The Tennessee Supreme Court has explained:

> [Rule 403] is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

*State v. James*, 81 S.W.3d 751, 757-58 (Tenn. 2002) (internal quotations and citations omitted).

The record on appeal is void of the photographs that the defendant claims that trial court should not have admitted into evidence. It is the duty of the accused to provide a record that conveys a fair, accurate, and complete account of what happened concerning the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see State v. Taylor,* 992 S.W.2d 941, 944 (Tenn. 1999). Ordinarily, without an adequate record we would be unable to review the merits of the omitted issues, and we would "presume that the trial court's ruling was adequately supported by the record." *State v. Beech,* 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987). However, "[t]he rule has long since been firmly established in this State that a Court may take judicial knowledge of facts which it has learned in an earlier hearing of the same case and of what it has done at a previous hearing of that case." *Pruitt v. State,* 460 S.W.2d 385, 395 (Tenn. Crim. App. 1970).

Here, the court tried the defendant and co-defendant together. The co-defendant raised the issue of the admissibility of the photographs to which the defendant objects in his direct appeal, and another panel of this court has already ruled on the admissibility of the photographs in question during the co-defendant's direct appeal. This court concluded that:

> Dr. McMaster testified that the autopsy photos were necessary to explain her medical testimony. The record reflects that a total of thirty-nine (39) photographs were submitted for the trial court to review. Although the trial court engaged in a lengthy discussion, considering the relevance of the photos as well as weighing their probative value against any unfair prejudicial effect, the trial court did not specify which photos it referred to on the record. Nevertheless, the trial court excluded twenty-six (26) of the thirty-nine (39) photographs. We have also specifically reviewed the photographs admitted during the

medical examiner's testimony and conclude that the trial court did not abuse its discretion by their admission. Accordingly, [co-defendant] is not entitled to relief on this issue.

*Dorantes I*, 2009 WL 4250431, at *11. We take judicial notice of this court's ruling on the photographs during the co-defendant's direct appeal. We conclude that the defendant has waived the issue of the admission of photographs of the victim. Despite the defendant's waiver, a panel of this court addressed this issue in *Dorantes I* and concluded that the trial court did not abuse its discretion. The defendant is without relief for this issue.

### 6. *Use of the term Battered Child Syndrome as the cause of the victim's death*

Next, the defendant argues that the trial court erred when it allowed the state's expert to refer to the victim's cause of death as Battered Child Syndrome. According to the defendant, "[t]he danger of unfair prejudice to [her] clearly outweighed the probative value of the use of this term." The defendant claims that the jury's hearing the expert's testimony that the victim died due to Battered Child Syndrome was prejudicial because it determined the issue of whether the defendant had abused the victim for the jury.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *Porterfield,* 746 S.W.2d at 450. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

The trial court allowed the state's expert, Dr. McMaster, to testify regarding the victim's injuries, including the diagnosis of Battered Child Syndrome. Dr. McMaster did not use the term broadly or as a generalization. She testified in detail regarding the nature of the victim's injuries and whether the explanation given for the injuries was reasonable. Battered Child Syndrome is "a medical diagnosis used to describe a child who has been subjected to repeated bouts of severe physical child abuse." *Dorantes I,* 2009 WL 4250431, at *5. The defendant admits in her brief that Battered Child Syndrome is an accepted medical diagnosis and that the jury would have received the same information about the victim's injuries and physical condition without using the term Battered Child Syndrome. The defendant has not shown how Dr. McMaster's stating an accepted medical diagnosis as the cause of the victim's death is unfairly prejudicial. Accordingly, we conclude that the defendant is without relief for this issue.

## *7. Consecutive sentencing*

Finally, the defendant argues that the trial court erred when it ordered that she serve her sentences consecutively. Specifically, the defendant contends that the trial court erred by finding that she was a dangerous offender and that consecutive sentencing was necessary to protect the public from further criminal conduct by her.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and considers the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter,* 254 S.W.3d 335, 344-45 (Tenn. 2008).

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of following statutory criteria applies:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) [t]he defendant is sentenced for an offense committed while on probation; or
> (7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

If the court concludes that the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. *State v. Imfeld,* 70 S.W.3d 698, 708 (Tenn. 2002). First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *State v. Wilkerson,* 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are unnecessary for the other categories of Tennessee Code Annotated section 40-35-115(b). *State v. Lane,* 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the trial court found that the defendant was a dangerous offender "whose behavior indicate[d] little or no regard for human life, and no hesitation about committing a crime in which the risk to human life [was] high." We also conclude that the trial court found the *Wilkerson* factors by concluding that because of the manner in which the defendant committed the crime against her child, the attempts of the defendant and co-defendant to hide the abuse, and the defendant's not seeking treatment for the victim made consecutive sentencing necessary. A trial court need only find one statutory criterion to support an imposition of consecutive sentences. *See State v. Black,* 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). The record does not preponderate against the trial court's findings, and the defendant does not present any statutory or case law to support her position that the trial court should not have imposed consecutive sentences under the facts of this case. Therefore, we conclude that the trial court acted within its discretion when ordering consecutive sentences, and the defendant is without relief on this issue.

## Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE