# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 5, 2013 Session

## STATE OF TENNESSEE v. AARICKA BILEY

**Appeal from the Criminal Court for Shelby County**
**No. 10-04618    John Fowlkes, Jr., Judge**

---

**No. W2012-00414-CCA-R3-CD  - Filed June 14, 2013**

---

Appellant, Aaricka Biley, was indicted by the Shelby County Grand Jury for aggravated child abuse in Count One and aggravated child neglect or endangerment in Count Two. At trial, after the State's proof, the trial court granted a motion for judgment of acquittal with respect to Count Two. At the conclusion of the trial, the jury found Appellant guilty of aggravated child abuse. The trial court sentenced Appellant to thirteen years and six months in incarceration. After the denial of a motion for new trial, Appellant initiated this appeal. On appeal, Appellant argues: (1) the trial court erroneously failed to compel the State to elect a particular act or injury; (2) the trial court erroneously failed to charge the jury with an enhanced unanimity instruction; and (3) the evidence was insufficient to support the conviction. After a review of the record and applicable authorities, we conclude: (1) after the trial court dismissed one count of the indictment, the State was not required to make an election; and (2) the evidence was sufficient to support a conviction for aggravated child abuse. Consequently, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Neil Umsted Memphis, Tennessee, for the appellant, Aaricka Biley.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

On December 5, 2009, A.B.,[1] the twenty-three-month-old victim was transported to the emergency room at Le Bonheur Children's Hospital in Memphis by ambulance. Appellant, his mother, reported upon arrival that the child was getting over a cold and was having a hard time breathing.

After initial examination of the victim, the medical staff suspected abuse. A medical social worker, Veronica Jackson, was called to consult with the family. Ms. Jackson met with Appellant. Ms. Jackson reported that Appellant recounted her story about the victim getting over a cold. During the initial meeting Ms. Jackson did not mention that there was suspicion of abuse to Appellant; however, Appellant spontaneously denied any knowledge of injuries to her son and stated that she hoped the day care he attended had not injured him while he was in their care. In fact, Appellant mentioned previously filing a report against the day care because "her child smelled like sex before."

The medical evaluation performed at the hospital revealed that the victim had evidence of blood in his skull, swelling of the area between the brain and the skull, and elevated liver function. An MRI revealed that blood was collected along the left side of the victim's brain in the area between the brain and the skull. An ophthalmologist examined the victim and discovered hemorrhages in both retinas. Dr. Karen Larkin, Medical Director for Le Bonheur Children's Assessment Program, testified that she examined the victim December 7, 2009. She noticed abrasions on his forehead, swelling over his left eye, and bruising to his left thigh, in addition to the bleeding around his brain. Dr. Larkin opined that the injuries were consistent with injuries that would have occurred from rapid acceleration and deceleration.

One of the medical experts, Dr. Elliott Kanner, stated that it would require significant force or trauma to create bleeding in both eyes. Another expert, Dr. Robin Morgan, a pediatric neurologist, testified that the victim's condition was potentially life-threatening. Further, Dr. Morgan indicated that the victim's injuries were not consistent with the history given by Appellant during the initial emergency room admission. Dr. Morgan opined that the injuries were the result of some type of blunt force trauma or shaking trauma. According

---

[1] It is the policy of this Court to protect the identity of child victims of abuse by identifying them by their initials.

to Dr. Morgan, the injuries were consistent with the victim's being beaten on his back and stomach until he passed out and with being thrown or dunked into water.

Dr. Morgan stated that the victim had both acute and chronic subdural hematomas and bilateral retinal hemorrhages, possibly caused by a prior injury and a new injury. There was some disagreement among the medical experts as to whether the victim suffered a fracture to the skull.

Dr. Cynthia Cross concurred with Dr. Morgan. In her opinion, after reviewing the victim's medical chart, the injuries sustained by the victim were "most likely secondary to non-accidental trauma."

While the victim was in the hospital for several days, Appellant checked herself into Lakeside Behavioral Health Center. Aliani Ronai was responsible for the initial needs assessment of Appellant. During the assessment, Appellant informed Ms. Ronai that she "believe[d]" the night before, she beat the victim on the back and stomach and then dunked him into cold water to revive him when he passed out. Appellant reported that she was suicidal and homicidal towards children. Specifically, Appellant said that she was "suicidal, [had] thoughts of drinking bleach, stabbing herself or shooting herself. She was homicidal towards her children and psychotic, in that, she felt like something out of the ordinary is after her and she hears things in the attic." Appellant's statements were "very specific" and "concrete."

After she was admitted to the East Unit, Appellant also spoke with James Shead, a registered nurse at Lakeside. This unit was characterized as the "most acute" and housed people who were dealing with "psychosis, seeing thing[s] others don't see, hearing things other[]s don't hear." Appellant informed him that she was there because she hit her son and wanted to "better manage the situation." Mr. Shead admitted that his notes reflected that the conversation with Appellant took place on December 6 at 1:08 p.m. but that the notes should have been dated December 7 at 1:08 a.m.

Dr. Kenny Terry, a psychiatrist, met with Appellant while she was a patient at Lakeside. She was admitted to the East Unit for "more severe patients." According to Dr. Terry, when Appellant was asked about abusing her son, she said it was all a mistake, "a dream." Dr. Terry opined that Appellant's behavior indicated some form of psychosis and possibly bipolar disorder or schizoaffective disorder. Dr. Terry also noted that there were hints of mania in Appellant's behavior. Appellant was prescribed Abilify to combat routine depression, bipolar disorder, schizoaffective disorder, and schizophrenia. Dr. Terry also prescribed Appellant Risperdal, the mood stabilizer Trileptal, Congentin for side effects, Celexa for depression and anixety, and Naproxen for pain associated with a fall. Dr. Terry

transferred Appellant to the West Unit after his assessment because he did not think that she was grossly psychotic. Appellant displayed signs of hallucinations, agitation, anxiety, and depression resulting in a significant loss of function. Appellant also displayed "hyper religiosity" during her interview. Despite Appellant's behavior and statements, Dr. Terry did not diagnose Appellant with bipolar disorder because he did not witness a manic episode during her stay at Lakeside.

Lieutenant Kathleen Lanier of the Memphis Police Department's Sex Crimes Unit investigated the injuries to the victim. She was not allowed to interview Appellant while she was a patient at Lakeside. Appellant came to the police department for an interview after she was discharged from Lakeside. Appellant met with Lieutenant Lanier on December 30, 2009. Appellant claimed that on December 5, the victim was gasping for air, so she called for an ambulance. After the victim was transported to the hospital and evaluated, Appellant learned that the CAT scan of the victim showed injuries to the victim's head and that his liver enzymes were elevated. Appellant stated that when she learned this information, she left the hospital because she felt that she needed a mental evaluation. Appellant denied harming the victim and did not suggest that anyone else, including the day care, had harmed the victim.

At the time of the injuries, the victim was attending day care. Appellant picked the victim up early on December 1, 2009, at around 11:30 a.m. According to day care records, another teacher called Appellant to pick the victim up early but it was not clear from records if the victim was picked up because he was sick or for another reason. Tonja Evans, another day care employee, recalled that the victim was sick with a bad cold and was throwing up phlegm. No one at the day care noticed anything unusual about the victim's health or physical appearance during the week leading up to the victim's injuries. The victim returned to day care the next day. Appellant picked the victim up from day care on December 3, 2009. According to day care employees Mieshia Bailey and Samika Thompson, there did not seem to be anything wrong with Appellant on December 3, 2009, or during the week prior. On December 3, the attendance records did not reflect a sign-in time for the victim but reflected that the victim was signed out at 6:00 p.m.

Appellant's sister, Valencia Biley, testified that she saw Appellant and her son on a daily basis during November and December of 2009. Ms. Biley had never seen Appellant mistreat her children. She described Appellant as quiet but adventurous and clumsy. Ms. Biley denied picking the victim up from day care on December 2 or 3, 2009. She acknowledged that she sought custody of the victim only because Appellant was struggling financially.

At the time of trial, the victim lived with Xaviera Ware. Ms. Ware did not visit the victim at the hospital and did not see him in the days preceding his hospital admission. She has never asked Appellant about the cause of the victim's injuries.

Monique Ware, Appellant's sister, went to the hospital on December 5. She saw the victim that night and he was acting "normal." She stated that the Appellant was at the hospital when she was there but left before she did. She had never seen Appellant mistreat the victim.

Appellant called her own expert, Dr. Louis Parvey, a pediatric radiologist, to testify at trial. He stated that the victim had an acute subdural hemorrhage that was anywhere from three hours to ten days old but most likely no older than five days old. In his opinion, the victim's brain appeared normal, and he did not see any indication of a fracture of the skull. He observed spreading in the sutures of the brain which he described as "like growth plates" between the skull bones that allow for growth of the brain. The spreading was potentially caused by swelling of the brain or fluid collection around the brain. Dr. Parvey did not personally observe the victim.

Dr. Thomas Boulden, a pediatric radiologist, interpreted the MRI of the victim. His finding was consistent with a "chronic hemorrhage that extended from the right side of the child's head up into the front of the child's head." Dr. Boulden also identified another hemorrhage that appeared to be more recent or subacute, two to three weeks old. It was located between the two halves of the brain in the back of the head on top of the cerebellum. Dr. Boulden defined a chronic hemorrhage as one greater than three or four weeks of age. According to Dr. Boulden, the victim's injuries were consistent with two separate episodes of injury.

Appellant also called Dr. John Galaznik, an expert in general pediatrics with a concentration in child abuse. He reviewed the victim's medical chart and denied any fractures. He opined that the victim was suffering from a chronic subdural effusion, or fluid, around the entire left brain, with new bleeding to the posterior. He stated that it would be impossible to predict the age of the chronic subdural, and it could "rebleed or have episodes of new bleeding with minimal or no trauma." He described the retinal hemorrhages as "minimal" and did not see any brain injury. Dr. Galaznik did not see anything in the victim's medical chart or in Appellant's statements made either at Lakeside or the hospital that would be consistent with the victim's being beaten and dunked into water. He did not see anything indicating "any significant physical evidence to confirm that [explanation]." In other words, he could not conclude that the injuries were non-accidental.

At the conclusion of the State's proof, counsel for Appellant moved for a judgment of acquittal concerning the charge of aggravated child neglect or endangerment. The trial court granted the motion. At the close of all the proof, the jury found Appellant guilty of the remaining charge of aggravated child abuse. At the sentencing hearing, the trial court sentenced Appellant to thirteen years and six months in incarceration. Appellant filed a motion for new trial. The trial court denied the motion. Appellant filed a timely notice of appeal. On appeal, she challenges the trial court's failure to require the State to make an election of offenses, the trial court's failure to issue a unanimity instruction to the jury, and the sufficiency of the evidence.

*Election of Offenses and Unanimity Instruction*

Appellant's first complaint on appeal is that the trial court improperly failed to compel the State to elect the basis for the offense when the "jury deliberated on a single count after hearing proof and argument of injuries from separate acts." Specifically, Appellant insists that the proof at trial showed both acute and chronic injuries sustained by the victim which, according to the expert testimony, were sustained at different times. Thus, without an election of offenses, the jury verdict was not necessarily unanimous. The State disagrees, insisting that the proof did not require either an election or an enhanced instruction on jury unanimity because the State based its case on Appellant's actions between the last time the victim was seen at day care on December 3, 2009, and his arrival at the emergency room on December 5, 2009.

Our supreme court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim. *See State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). The requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *Brown*, 992 S.W.2d at 391.

The requirement of election and a jury unanimity instruction exist even though Appellant has not requested them. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court, even absent a request from the defendant, to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *Shelton*, 851 S.W.2d at 137. Moreover, failure to

follow the procedures is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. *See State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000); *see also Shelton*, 851 S.W.2d at 138.

Election of offenses is essential because if the State fails to specify which act relates to which offense, a defendant is at risk of being convicted by a partial jury in a verdict that is not unanimous. As the court has stated:

> In those situations, such as when a child alleges some type of abuse yet cannot relate when the offenses occurred, the jury must support a verdict of guilt by unanimous decision that the defendant committed one specific offense-one juror may not convict based upon a decision that the defendant committed the offense on one date, while another juror believes the defendant committed the same statutory offense, but on a different date. Such a defendant would be convicted of different offenses, each by a partial jury.

*State v. Hodges*, 7 S.W.3d 609, 624 (Tenn. Crim. App. 1998). "Where the state presents evidence of numerous offenses, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts." *State v. Hodge*, 989 S.W.2d 717, 721 (Tenn. Crim. App. 1998). Furthermore, our supreme court has pointed out that jury unanimity, and therefore election, may be necessary to preserve the court's role as a possible thirteenth juror:

> "[T]here should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence. When a jury is charged, as here, to elect for itself the incidents on which it will convict, the court cannot be assured of the unanimity of the jury's verdict. Hence, when asked to function as "thirteenth juror" and assess the weight of the evidence to support the jury's verdict, the trial court cannot be certain which evidence was considered by the jury in reaching its verdict.

*Shelton*, 851 S.W.2d at 137. This court has previously concluded that failure to issue a jury instruction on election to insure unanimity constitutes reversible error. *See Hodge*, 989 S.W.2d at 721.

-7-

In the case herein, Appellant points to the fact that she was initially indicted with both aggravated child abuse and aggravated child neglect to support her argument that the State was required to elect as to which acts of Appellant supported each conviction at the close of proof. The two crimes are codified in the same statute, Tennessee Code Annotated section 39-15-402, which states:

> (a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment, as defined in § 39-15-401(b), and:
>
> (1) The act of abuse or neglect results in serious bodily injury to the child;
>
> . . . .
>
> (b) A violation of this section is a Class B felony; provided, however, that, if the abused, neglected or endangered child is eight (8) years of age or less, or is vulnerable because the victim is mentally defective, mentally incapacitated or suffers from a physical disability, the penalty is a Class A felony.

In *State v. Mateyko*, our supreme court stated that "the offense of child abuse and neglect proscribed by Tennessee Code Annotated section 39-15-401(a) is a single offense that may be committed through one of two courses of conduct: child abuse through injury and child abuse through neglect." 53 S.W.3d 666, 668 n.1 (Tenn. 2001). While a single offense may be committed through two courses of conduct, this Court has noted that where a defendant is charged with both aggravated child abuse and aggravated child neglect, the trial court should issue a jury instruction that jurors may find the defendant guilty of one of the two charged offenses, but not both. *See State v. Vernita Freeman*, No. W2005-0294-CCA-R3-CD, 2007 WL 426710, at *9 (Tenn. Crim. App. at Jackson, Feb. 6, 2007). Specifically, the court stated:

> The determination of whether the State is [proceeding] upon alternative theories of prosecution or upon separate and distinct crimes should be resolved at a jury instruction conference in order that the jury may be properly instructed with regard to their verdict. Obviously, if the State is proceeding upon alternative theories, the jury should be instructed that they can find the defendant guilty of one or the other of the theories, but not both.

*Id.* at *9 n.2. In the case herein, as pointed out repeatedly by Appellant, the original indictment charged Appellant in two separate counts under Tennessee Code Annotated

section 39-15-402. Specifically, Appellant was indicted for one count of aggravated child abuse and one count of aggravated child neglect or endangerment. At the conclusion of the State's proof, however, the trial court granted the motion for judgment of acquittal with respect to the charge of aggravated child neglect or endangerment, leaving only the charge for aggravated child abuse. The indictment specified that Appellant committed the aggravated child abuse between December 3, 2009, and December 7, 2009. Looking at the proof, the State presented evidence of multiple injuries sustained by the victim, including bleeding around the brain and skull; hemorrhaging around both eyes; and bruising on the face, head, stomach, and thigh. The majority of the evidence, including Appellant's own statements, point to one criminal event which occurred on the night prior to the victim's hospitalization. "When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." *Adams*, 24 S.W.3d at 294. Thus, after the trial court dismissed the second count of the indictment and the State argued in closing arguments that the injuries to the victim occurred as a single episode of abuse occurring some time between December 3 and December 7, Appellant was aware of the acts upon which the State relied to support the charge for aggravated child abuse. While the record may contain conflicting testimony from medical experts as to the existence of both chronic and acute injuries to the victim, the State based their proof and case on the injuries sustained by the victim between December 3 and December 7 which resulted in his hospitalization. Therefore, there was no need for an election at the close of proof and the trial court did not err in failing to instruct the jury.

*Sufficiency of the Evidence*

Appellant argues that the proof at trial was not sufficient to support the conviction. Specifically, Appellant claims that the proof did not support a finding that Appellant treated the victim "other than by accidental means, in such a manner as to inflict injury." Further, Appellant argues that there was no proof as to the age of the injuries and whether Appellant was the person who knowingly committed the abuse. The State disagrees.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *See Tuggle*, 639 S.W.2d at 914.

To sustain Appellant's conviction for aggravated child abuse, the State had to prove that Appellant committed the offense of child abuse, and the conduct resulted in serious bodily injury to the child. *See* T.C.A. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty. . . ." *Id.* § 39-11-106(a)(2). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(34)(A)-(E).

Viewing the evidence in a light most favorable to the State, Appellant took the victim to the hospital. Upon examination by medical personnel, it was suspected that the victim's injuries were the result of an intentional act of abuse. Several medical experts testified that the victim's injuries, including retinal hemorrhaging and subdural hematoma, were the result

of non-accidental trauma. Appellant checked herself into Lakeside Behavioral Health in close proximity to the victim's admission to the hospital and informed the staff that she beat her child until he was unconscious and then submerged him in water. Appellant also claimed that she was suicidal and homicidal toward her children. At least one of the experts, Dr. Morgan, testified that the victim's injuries were consistent with Appellant's statements to medical personnel at Lakeside. Based on the medical proof, Appellant's statement, and the observations of the staff at Lakeside Behavioral Health, we conclude that the evidence was sufficient for the jury to determine Appellant caused the victim's injuries and they were the result of non-accidental trauma. Appellant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE